[Crim. No. 2818. In Bank.—June 30, 1927.]

## THE PEOPLE, etc., Respondent, v. EARL J. CLARK, Appellant.

[1] CRIMINAL LAW—MURDER—MOTION TO REINSTATE APPEAL.—While there is no statute governing the subject in this state, the supreme court, independent of statutory authority, has power to dismiss an appeal in a criminal case where the appellant is a fugitive from justice, and the dismissal of an appeal on account of the escape of a prisoner is not a denial of due process of law.

[2] ID. — ESCAPE OF PRISONER — DISMISSAL OF APPEAL — REINSTATEMENT OF APPEAL.—Assuming that the supreme court has power to reinstate an appeal in a murder case dismissed on account of the escape of the prisoner, it should only be exercised in those cases where it is plainly made to appear that the denial of its exercise would work a palpable injustice or wrong upon the appellant.

[3] ID.—MOTION FOR REINSTATEMENT OF APPEAL—CONSIDERATION OF MERITS OF APPEAL.—Where an appeal in a murder case was perfected and the cause argued and submitted for decision while the appellant was in legal custody, upon a motion to reinstate the appeal which was dismissed on account of the escape of the prisoner, it is proper for the court to look into the record of the appeal and with the assistance of the argument of counsel

---

1. Right of fugitive from justice to prosecute an appeal, notes, 41 Am. Dec. 272. See, also, 8 Cal. Jur. 554. Effect of escape on appeal from conviction, note, 26 L. R. A. (N. S.) 921. See, also, 2 R. C. L. 63. Review of conviction for crime as affected by escape of person convicted, notes, 3 Ann. Cas. 512; 13 Ann. Cas. 497.

presented and the briefs filed to consider the merits of the appeal before finally ruling upon the motion to reinstate the same.

[4] Id.—Evidence—Declarations of Deceased—Harmless Error.— In a prosecution for murder, conceding that the statement of the deceased made to his companions just after leaving the scene of the homicide that he had been stabbed was inadmissible, as not being a part of the *res gestae* and not made in the presence of the appellant, its admission could not have seriously prejudiced the appellant's case where the testimony of another witness was that the appellant used a knife in the encounter between him and the deceased.

[5] Id.—Harmless Evidence.—In a prosecution for murder, where a female employee of the defendant at the premises where the homicide was committed was asked what appellant directed her to do in the house in which they were living, the answer, "Several things," made before objection to the question, could not have been harmful to the appellant, as it was so general and indefinite that it meant nothing.

[6] Id.—Occurrences Prior and Subsequent to Homicide.—There was no error in such a case in admitting evidence of events that transpired just prior to the appearance of the deceased at appellant's house, the place of the homicide, where the only testimony given by the witnesses was that they rode out in a car driven by one of them, the other sitting beside the driver, the court having sustained all objections to any evidence of conversations between the men during the ride and prior to the beginning thereof and having struck out, on motion of appellant's counsel, all conversations which had been admitted without objection; nor was there any prejudicial error in admitting evidence of the occurrences happening after the deceased and his companions left appellant's place, where they consisted simply of the acts of the men in returning to their ship, which were of slight consequence and had no particular bearing, one way or the other, on any phase of the controversy, and the statement of the deceased that he had been stabbed, one of the witnesses having testified that a knife was used in the encounter.

[7] Id.—Evidence—Securing of Gun by Defendant—Consciousness of Guilt.—Evidence in a prosecution for murder, to the effect that the next morning after the encounter with the deceased the defendant secured a gun from a certain party and had it with him at the time of his arrest, was admissible as tending to indicate a consciousness of guilt.

5.  See 8 Cal. Jur. 619.
6.  See 8 Cal. Jur. 619.
7.  See 8 Cal. Jur. 42.

[8] ID.—EVIDENCE OF OTHER OFFENSES—WHEN ADMISSIBLE.—In a prosecution for murder it was competent for the prosecution to show the conditions under which the deceased and his companions entered appellant's place, where the homicide occurred, to the end that they might not appear to be intruders, and where the circumstances indicated that appellant was engaged in the illegal selling of liquor and in the keeping of a disorderly house and that he was not adverse to the deceased and his companions entering his place and purchasing his wares, the evidence was not inadmissible in the fact that it showed the commission of the other offenses.

[9] ID.—ALLEGED MISCONDUCT OF DISTRICT ATTORNEY.—In this prosecution for murder it is held that there is no merit in the contention that the district attorney in his opening statement to the jury and in his final argument was guilty of misconduct to the prejudice of the rights of appellant.

---

(1) 12 C. J., p. 1210, n. 81; 17 C. J., p. 195, n. 12.   (2) 17 C. J., p. 196, n. 21 New.   (3) 17 C. J., p. 196, n. 21 New; 30 C. J., p. 312, n. 42.   (4) 30 C. J., p. 443, n. 77.   (5) 17 C. J., p. 309, n. 73. (6) 30 C. J., p. 193, n. 53, p. 203, n. 82.   (7) 30 C. J., p. 209, n. 72. (8) 16 C. J., p. 588, n. 8.   (9) 17 C. J., p. 196, n. 21 New, p. 298, n. 22.

MOTION to reinstate an appeal from a judgment of the Superior Court of Los Angeles County dismissed on account of appellant's escape from custody.   Sidney N. Reeve, Judge. Motion denied.

The facts are stated in the opinion of the court.

John F. Groene and Buel R. Wood for Appellant.

U. S. Webb, Attorney-General, and H. H. Linney, Deputy Attorney-General, for Respondent.

CURTIS, J.—Motion to reinstate appeal heretofore dismissed by this court for the reason that appellant had escaped from jail subsequent to the taking of said appeal, and was a fugitive from justice at the time of the dismissal thereof.   The appellant was convicted of murder in the first degree and sentenced to suffer the death penalty. He appealed to this court from the judgment of convic-

---

9. See 8 Cal. Jur. 621.

tion. On the eighth day of March, 1926, said appeal, after the same had been argued herein, was submitted for decision. On the sixteenth day of March, 1926, appellant escaped from the county jail of the county of Los Angeles, where he was being detained pending the determination of his appeal. After his escape from jail, and prior to his recapture, this court, on April 7, 1926, upon motion of the attorney-general, made an order that said appeal stand dismissed unless appellant, within thirty days from said date, return to the custody of the sheriff of said county of Los Angeles. Appellant failed to return to the custody of said sheriff within said period of thirty days, and this court, on the sixth day of June, 1926, entered its order finally dismissing said appeal. Thereafter appellant was apprehended and returned to the custody of said sheriff, and on the eighth day of March, 1927, he presented his motion to set aside and vacate said order of dismissal and to reinstate his appeal. The attorney-general resists said motion, and bases his objection to the granting thereof on the ground that this court has no jurisdiction over said appeal after its order of dismissal, and, therefore, that it has no power to reinstate the same.

[1] There is no statute governing the subject in this state. That the court, independent of statutory authority, has power to dismiss the appeal of an appellant who is a fugitive from justice has long been accepted as a proper exercise of the jurisdiction of the appellate courts of this state. (*People* v. *Redinger,* 55 Cal. 290 [36 Am. Rep. 32]; *People* v. *Elkins,* 122 Cal. 654 [55 Pac. 599]; *People* v. *Sitz,* 21 Cal. App. 54 [130 Pac. 858].) It is also the settled law in other jurisdictions. (17 C. J., 195, and cases cited.) In the state of Texas the right is given by statute. (*Cobb* v. *State,* 69 Tex. Cr. 619 [154 S. W. 1195]; Tex. Code Crim. Proc., art. 880.) The dismissal of an appeal on account of the escape of a prisoner is not a denial of due process of law. (*Allen* v. *Georgia,* 166 U. S. 138 [41 L. Ed. 949, 17 Sup. Ct. Rep. 525, see, also, Rose's U. S. Notes].) There is little to be found in the reports as to the power of a court, after the dismissal of an appeal upon this ground, to thereafter set aside the order of dismissal and reinstate the appeal, after the appellant has voluntarily surrendered himself, or has been returned to custody. The Texas statute

provides that the order dismissing the appeal shall be set aside if it shall be made to appear that the accused has voluntarily returned to custody within ten days after the date of said order. Under this statute it has been held that the court was without power to set aside the order of dismissal, except in the case of the voluntary return of the accused to custody within the ten-day limit, and that the recapture of the prisoner and his forcible return to custody within ten days after his escape therefrom did not give the court power to set aside the order of dismissal. (*Lunsford* v. *State,* 10 Tex. App. 118; *Ex parte Wood,* 19 Tex. App. 46; *Loyd* v. *State,* 19 Tex. App. 137.) On the contrary, the supreme court of Louisiana, in which state there is no statute governing the subject, has held that it has power to reinstate the appeal of an appellant, dismissed by reason of his escape from custody. (*State* v. *Thibodeaux,* 48 La. Ann. 600, 605 [19 South. 680, 682].) As to its power in this regard the court said: "Considering this a case in which the accused has been sentenced to the extreme penalty of the law, and that our decrees should in doubtful cases favor the liberty of the citizen, and the right of appeal, we have concluded to grant the application to reinstate defendant's appeal."

[2] We think it unnecessary, however, to decide the question whether this court has or has not the power to reinstate an appeal dismissed on account of the escape of the prisoner. Assuming, for the sake of argument, that the court has such power, it should only be exercised in those cases where it is plainly made to appear that a denial of its exercise would work a palpable injustice or wrong upon the appellant. We are satisfied in the present action that no advantage would accrue to the appellant by the reinstatement of his appeal. [3] We have already referred to the fact that the appeal in this action was perfected and the cause argued and submitted for decision while appellant was in legal custody. The record on the appeal is, therefore, before us. Both the opening and closing briefs of appellant and respondent's brief are on file herein, and this court has had the benefit of argument of counsel on behalf of the respective parties. We think, therefore, that it is proper for us to look into the record of this appeal on file herein and, with the assistance of the argument of counsel already

presented and their briefs before us, to consider the merits of said appeal before finally ruling upon the motion to reinstate the same; for, if the appeal is without merit, it would be a useless proceeding for this court to reinstate the same, and thereafter, upon the consideration of its merits, to deny it. Such a course would simply prolong this proceeding without securing to the appellant any beneficial results.

An examination of the record shows that the contention of the prosecution was that the deceased, Silva, met his death as the result of a murderous assault made upon him by the appellant, in which appellant, with a knife, stabbed the deceased in the lower part of his abdomen, as a result of which Silva died a few hours thereafter. The main contention of appellant on this appeal is that the evidence is insufficient to justify the verdict of the jury finding the appellant guilty, and particularly that there is no evidence that in said assault the appellant used a knife upon the deceased, or that he had a knife in his hands during said assault. This contention can best be met by a brief review of the testimony of those present at the time of the encounter between appellant and the deceased.

The evidence shows that the deceased, Silva, and three companions, Kilbey, Utrecht, and Lane, were sailors on the vessel "City of Los Angeles," which, on the evening of the 18th of April, 1925, was lying in the harbor of San Pedro. These four, on that evening, in company with two taxicab drivers, Densmore and Card, went to appellant's place, located some four or five miles from San Pedro. This place was a dwelling-house which appellant had recently rented and moved into, and in which he was illegally selling intoxicating liquor. There was also residing in this house a young girl named Mamie Stephens, and the evidence tended to show that she was being kept at said place by appellant for immoral purposes. After arriving at the house, the six men were served with drinks by appellant. They had been in the house about a half hour when the altercation took place between the appellant and the deceased. It began in the room occupied by the girl, Mamie Stephens, but was soon transferred to the adjacent and main room, where the other men were. Whether it arose over the accusation by appellant that

Silva and his companion had not paid for the drinks they had received, from appellant, or over the girl, Mamie Stephens, or for both of these reasons, is not clear, nor is it material. As to the details of this encounter, the persons present testified at the trial, and we will briefly refer to such evidence, and particularly to that portion which tends to show whether appellant used or did not use a knife upon the deceased.

The witness Kilbey testified: "I was sitting at the doorway there, the entrance to the bedroom in the sitting room, and all of a sudden there I heard the door open and here comes Silva backing out with his hands up like this . . . As soon as the door opened he simply backed out with his hand on the defendant, pretty close to him. Right directly I got up and I followed Lane out, Mr. Lane out of the house." The witness Lane testified: "Of course, as quick as he opened the door I seen the condition of things, I started out. Q. What do you mean you saw the condition of things; what did you see? A. I saw Mr. Silva come out like this with his hands lifted. Q. Over his head? A. Over his head; so I seen there was trouble and I thought I would get out of it and walked out and Mr. Kilbey followed me. . . . Q. Where was Silva when you saw him there? A. Standing in the middle of the door coming out of room 2. Q. Right in the threshold? A. Yes, sir. Q. Did you see Clark at that time? A. Clark was right in front of him standing with his right hand behind him in that manner (indicating). Q. Did you see where his left hand was? A. It was at this side. Q. Is that all you saw at that time? A. That is all I saw; I was leaving the room." Mamie Stephens' testimony was as follows: "Silva started to walk out of the room and kind of walked backwards and Clark was shoving him, he wasn't really shoving him but pushing him along, and Silva went out of the room and I don't know what he said, when he turned around to say something Clark had his hand on his shoulder and he had his hand behind him—Clark had his hand, his right hand behind him, and I thought I saw a knife in his hand so I— Mr. Groene: I object to what she thought, your Honor, as incompetent, irrelevant and immaterial. The Court: Yes, describe what you saw. Mr. Groene: I move that it be stricken from the record. A. (Continuing) Well,

he had something in his hand and I went over and picked at whatever he had, and he pushed me and I went on in the bathroom and I changed my dress into a pair of sailor pants and went on the outside.'' Utrecht's testimony: ''Then Clark grabbed hold of Silva by the coat lapel; he had one end (hand) up against Silva's body, and I was on my feet there and I got over near the bedroom door and Kilbey and Lane and Card came in there from the other room. He heard the argument between Silva and Clark, and he said, 'Come on, fellows, let's get out of here,' and Clark and Silva then, they were arguing, one saying he paid for the drinks and the other saying he hadn't paid for them and all of this time Clark had one arm up to Silva that way and Silva assumed that attitude; then I saw Clark's arm go this way three times right at Silva's body, and then I saw Densmore, he came in from the bathroom into the bedroom, and then into the sitting-room where we were.'' Testimony of the witness Card: ''Q. Where were you at that time? A. I was right in here, in the kitchen doorway. Q. Yes, and you saw Silva coming out of that door? A. Well, he was coming out kind of fast and making considerable noise. Q. What did he say? A. Kind of conglomeration. I could not understand his words, except that he was going to pay something. Q. Then what happened? A. Then Clark got ahold of him some way by the coat, and I don't know, he made several rapid motions with his right hand and he stepped back from the doorway, then with his right hand behind him, and he says, 'I will kill you, I will kill you.' Q. Then what happened? A. Then Silva, he had been having his hands in the air, kind of gesticulating; he had— He was about ready to go and quit. Testimony of witness Densmore: ''This Clark then, he says, 'Well,' he says, 'I don't care, I want you to get out of here, the whole bunch of you.' So then Silva said something to him about all right, he would leave; and then Clark told him, he says, 'if you fellows want trouble I will give it to you,' and he stood with one hand on Silva's collar and his right hand was in back of him, so when he made that remark he pulled his right hand out and he cut Silva three times in the stomach— . . . Q. Did he say anything at that time? A. Not that particular moment, but at about two seconds later after he had cut Silva, he told him

then, 'I will kill you, you son-of-a-B, I will kill you.' . . .
So then he turned Silva loose. Silva says, he says, 'I will
go.' " Later on, we find the following in this witness' testi-
mony: "Q. (By Juror): Did you testify that you saw the
defendant make two or three distinct jabs that afternoon at
Silva, the deceased? A. When he stabbed him? The Juror:
Yes. A. He struck one blow and then he kind of withdrawed
the knife—that is to say, this way, and give two more, but
it was not withdrawed clean from the man's body. The
Juror: You saw the knife in his hand? A. Yes, sir." The
witness Densmore, a short time after the affray between the
appellant and the deceased, took the appellant and the girl,
Mamie Stephens, in Densmore's machine away from the
house in which the affray took place. He testified that as
they were leaving the premises, in answer to a question
asked him by the prosecution: "Well, before he (Clark)
got into the car he threw something in an underhanded
way out into the grass and after I had backed the machine
out on to the street and started away from the house, then
he spoke up to me and says, through the window, he was
sitting in the back with the girl and I was sitting in the
front seat, and there was a window between, and he opened
the door and stuck his head out of the window and he said:
'They will never find that.' I said, 'What?' He says,
'That knife.' He said, 'I broke it all up and threw it
away.' " The next day, and after the arrest of the de-
fendant at Culver City, where he had gone with the girl,
Mamie Stephens, the officers found on the premises, where
the encounter between appellant and the deceased had taken
place, the handle of a knife, in which, according to the
testimony of one of said officers, "the blade or the middle
part had—was fresh. It looked as if it had recently been
broken."

This evidence was, without doubt, sufficient to justify the
jury in believing that the wound inflicted upon the deceased
had been made by a knife in the hands of the appellant.
While only Densmore testified positively that he had seen
the appellant stab the deceased with the knife, the others saw
the encounter between the two men, and some of them testi-
fied to movements made by appellant with his hands, which
strongly corroborated the testimony of Densmore that ap-
pellant used a knife upon the deceased. But, independent

of the evidence of these last-mentioned witnesses, the testimony of Densmore is positively and directly to the effect that the appellant used a knife in his assault upon the deceased. His testimony alone is sufficient to justify the verdict of the jury, and, with it in the record, this court would not be justified in setting aside the verdict on the ground of its insufficiency.

Immediately after the trouble between the two men, Silva, with his three companions and Card, left in the latter's taxicab, and were taken by Card to San Pedro, where they immediately boarded their ship. The only unusual circumstance regarding the evidence as a whole is that Silva gave no outward evidence that he had received a serious wound. While he did say, on his way back from the house of the defendant to his ship, that he had been stabbed, he did not act the part, nor did this remark seem to make any perceptible effect upon his companions. On arriving at the harbor he insisted on paying for the taxicab, and, with his companions, Kilbey, Utrecht, and Lane, went on board their vessel, each man going to his own room. But within a few minutes—one witness gives the time as about three minutes—he heard Silva holler, and, hastening to his room, the three men found Silva, partially undressed, lying in his bunk with a severe cut or wound on the left side of his abdomen, slightly below the navel. It had taken them only about thirty minutes to drive from appellant's house to the place where their ship was docked. From the effect of this wound Silva died a few hours thereafter. There was no evidence tending in the slightest degree to show that Silva had or could have received the wound after he left appellant's house. He was not out of the sight of his three companions from the time they left appellant's house except for the short space of about three minutes after he left them to go to his room upon the ship. Their rooms were in close proximity to each other, and had any assault or encounter taken place between Silva and any other person they would have heard it. This circumstance, therefore, while unusual, would not be sufficient to overcome the effect of the other testimony in the case, pointing to the guilt of the appellant.

[4] Appellant claims that it was error for the court, over his objection, to admit in evidence the statement of

Silva, made to his companions in the taxicab just after leaving appellant's place, that he had been stabbed. Conceding this evidence to be inadmissible, as not being a part of the *res gestae* and not made in the presence of the appellant, its admission could not have seriously prejudiced the appellant's case in view of the positive testimony of Densmore that the appellant used a knife in the encounter between him and the deceased.

[5] A further assignment of error is made by appellant to the action of the court in overruling his objection to a question asked of the witness Mamie Stephens as to what appellant directed her to do in the house in which they were living. The question was answered before the objection was made, and appellant did not ask to have the answer stricken out. The only answer, however, given by the witness to this question was: "Several things." It may be conceded that, as the objection was overruled, a motion to strike out the answer would have been denied. We fail to see, however, how the answer, "Several things," given by the witness, could have been harmful to appellant. It was so general and indefinite that it meant nothing whatever, and could not have helped the case of the prosecution nor damaged that of appellant.

[6] The further contention is made that the court erred in permitting witnesses to testify as to what occurred just prior to the men going to appellant's house, and as to events transpiring after leaving appellant's place. As to the evidence regarding events that transpired just prior to the appearance of the men at appellant's house, as far as we are able to gather from the record and from appellant's briefs, the only testimony given by the witnesses was that they rode out in a car driven by Densmore, and that Card was sitting alongside of him on the front seat of the car. The court sustained all objections to any evidence of conversations had between the men during the ride and prior to the beginning thereof, and, on motion of appellant's counsel, struck out all conversations which had been admitted without objection. We can see no ground upon which the appellant can base any claim of error in this regard. As to occurrences happening after the men left the appellant's place, these simply covered the acts of the four men in returning to their ship, were of slight conse-

quence, and had no particular bearing, one way or the other, upon any phase of this controversy. The only one of these circumstances which might be questioned was the conversation between these men in which Silva stated that he had been stabbed, and which we have already referred to and considered. [7] Under this assignment appellant takes exception to evidence to the effect that the next morning after his encounter with Silva he secured a gun from one James Valenti in San Pedro, and had it with him at the time of his arrest. This evidence was admissible as tending to indicate a consciousness of guilt. [8] Appellant makes the further contention that he was injuriously affected by the introduction of evidence tending to prove that he was guilty of other crimes, such as the selling of intoxicating liquor and the keeping of a disorderly house. It is true that the evidence is capable of such a construction. But it was competent to show the conditions under which the men entered appellant's place, to the end that they might not appear to be intruders and unbidden guests of the appellant. The circumstances surrounding their visit indicate clearly that appellant was engaged in the illegal selling of liquor and in the keeping of a disorderly house, and that he was not adverse to Silva and his companions entering his place and purchasing his wares. This evidence showed that the men were in the house with the consent and approval of appellant, and if it showed the commission of other crimes by him, this fact did not affect its admissibility. It was competent and relevant notwithstanding it was proof of other offenses. (*People* v. *Craig,* 152 Cal. 42 [91 Pac. 997]; *People* v. *Hatch,* 163 Cal. 368 [125 Pac. 907].)

[9] The final complaint of the appellant is, that the district attorney in his opening statement to the jury and in his final argument of the case was guilty of such misconduct as to prejudice the rights of the appellant to have a fair and impartial trial. We have read in full the remarks of the district attorney before the jury and we fail to find anything therein that could be reasonably construed as prejudicial to appellant's legal rights. Appellant has made but few specifications of misconduct on the part of the prosecuting officer, none of which are well taken. We cannot feel that there is any merit in this contention.

The record on appeal before us presents no sufficient showing that would justify a reversal of the judgment. It would accomplish no useful purpose, and it would avail nothing to the appellant to reinstate his appeal, as a consideration thereof could only result in an affirmance of the judgment. We therefore feel constrained to deny appellant's motion to set aside the order dismissing his appeal, and it is so ordered.

Waste, C. J., Shenk, J., and Seawell, J., concurred.

Preston, J., dissented.