[Crim. No. 1836. Third Dist. Oct. 22, 1943.]

THE PEOPLE, Respondent, v. ROY CORNETT, Appellant.

Lewis H. DeCastle for Appellant.

Robert W. Kenny, Attorney General, T. G. Negrich, Deputy Attorney General, and T. C. McGettigan, District Attorney, for Respondent.

THOMPSON, J.—The defendant was convicted of the crime of murder of the first degree and sentenced to imprisonment for life. He was charged with killing Hellmuth Seefeldt on August 29, 1942. From the judgment of conviction and from the order denying a new trial this appeal was perfected. The evidence of the homicide is purely circumstantial. No eyewitness to the affair testified at the trial. The defendant failed to take the stand in his own behalf.

It is contended the judgment is not supported by the evidence for the reason that the prosecution failed to prove the corpus delicti, and because the evidence refutes the necessary element of malice to constitute first degree murder. It is also asserted the court erred in admitting evidence of another crime of forgery.

The homicide occurred in the remote, rugged, timbered region of the Sonoma coast country. Hellmuth Seefeldt was an unmarried man sixty-eight years of age. For twenty-four years he had owned and operated a sheep ranch in the vicinity of Cazadero. He lived alone in a cottage on that property. The ranch contained some timber, including a grove of redwood trees situated back of the barn about one-half mile from the house. He was peaceable, honest, industrious, frugal and thrifty. He had a bank account of about $3,000. It appears that he kept some money in a crock which he buried in a shop on the premises. The defendant was aware of that fact. The deceased was well and favorably known to the people in that vicinity. He disappeared August 29, 1942, and was never thereafter seen alive. About four months later his decomposed body was found buried in a secret grave in the hollow base of a redwood tree surrounded by a thicket of brush. The grave was covered with branches and twigs with the apparent purpose of concealing it. He had six fractured ribs.

The defendant and his family, consisting of a wife and eight children, moved to the Lorey ranch, adjoining the See-

feldt property, in April, 1942. Mr. Cornett was forty-two years of age. He was employed to cut and manufacture pilings from the timber on the Lorey place. His income was small. He was unable to provide for the needs of his family. He was formerly in the Army, but was court-martialed and convicted of an offense involving dishonesty in money matters. He was later discharged from the Army, and then came to California.

Soon after moving to the Lorey property the defendant became acquainted with Mr. Seefeldt and occasionally performed chores for him, for which he was fully paid. In June and July of 1942, Mr. Seefeldt was engaged in some war work in San Francisco. During two months' absence, by arrangement previously made, the defendant and his family moved to the ranch of the deceased, occupied his house and performed the work, including the care of some sheep. When Mr. Seefeldt returned to his home about August 1st, he planned a two-week visit to his relatives in New York. After that visit he returned to his Cazadero ranch August 22d. During his absence the defendant and his family continued to occupy and manage that property. On his way back from New York, Mr. Seefeldt stopped at San Francisco and purchased from Woolworth Company for use on his ranch several articles of hardware which he shipped to Cazadero in his own name. That package did not arrive until after his disappearance. It was delivered to the defendant and appropriated by him. He afterward falsely stated that the package contained household articles which the deceased had shipped to the defendant in his name and which he had given to him.

Immediately after the disappearance of Mr. Seefeldt the defendant began to take possession of his property and to sell and dispose of several articles. He claimed that he had a five-year lease of the place. When he was advised to record his lease, he said he intended to do so within a few days. Later he admitted that he had no written lease, but claimed that he had an oral lease of the property. He sold certain farm equipment and offered a refrigerator for sale for $140. He promptly began forging checks and drawing on the bank account of the deceased. September 3d he forged and cashed a check for $178. September 5th, he forged a check for $78, and on September 14th he forged another check for $137.

He subsequently admitted forging those checks. Soon thereafter he left the ranch and went to Sacramento where he was arrested.

The defendant made false and inconsistent statements to inquiring neighbors and friends of the deceased regarding his absence. He inferred that the deceased had gone to a nudist colony in Los Angeles. He told several persons that Mr. Seefeldt had bought a boat and that he was going to the South Sea Islands. William Parmeter and Robert Schneider were engaged in surveying property in the vicinity of the Seefeldt ranch a few days before the homicide. They knew the deceased well. They talked with him on August 26th and also on August 27th. He was seen on the ranch on August 28th. He rode with them to Cazadero on the first-mentioned date, but did not suggest that he intended to go to the South Sea Islands or elsewhere. They visited the ranch on August 29th to arrange with the deceased for a tree on his premises from which they desired to cut shakes. Upon inquiring for him from the defendant they were told that he left a note and had gone away, and that he "was planning on buying a boat and sailing to the South Seas." The defendant told them he had a five-year lease of the ranch and that he was going to "clean it up and . . . get rid of the scrap iron lying around." The defendant offered to sell to them scrap iron, old implements, a sheep-shearing outfit for $15, a quantity of cut stakes for $5 and a refrigerator for $140. They agreed to buy certain scrap iron and equipment for $45. They returned to the ranch the following day, which was Sunday, and also on September 6th, on both of which occasions they talked with the defendant about the absence of the deceased. The defendant escorted them into the dwelling house and other buildings on the premises. In the kitchen they observed food which had been prepared for a meal, only a portion of which had been consumed. They saw two of the deceased's guns in a rack on the wall. They were also shown the clothing and personal effects of the deceased in his trunk, which had not been removed. In that trunk the defendant also showed them a revolver which he said the deceased had left with him. They went into a shed where they observed a broken crock which had been buried in the earth in that building. The defendant told them he had struck and broke the crock with a crowbar. He suggested that the deceased

had buried money in that crock. It was then empty. In attempting to account for the absence of the money the defendant suggested that "Maybe he [the deceased] did it [took the money out] before he left, and covered it up again." He also said "Do you suppose whatever was in there that Mr. Seefeldt came back and got it? You know he is not supposed to come on the place for five years." The defendant wrote two letters to the relatives of the deceased in New York with the evident purpose of deceiving them regarding the absence of Mr. Seefeldt. He stated in one of the letters that he had left instructions not to let the neighbors know where he had gone.

The evidence shows without dispute that the deceased was present on his ranch, after his return from the visit to his relatives in New York, from August 22d to and including August 28th, for several witnesses saw and talked with him during that period of time. He was never thereafter seen by any of them. He was in normal good health. He voted at the primary election on August 25th. To none of the neighbors or friends with whom he talked during that time did he intimate that he was going away to the South Sea Islands or elsewhere. His guns and clothing and personal effects were not removed from his house. He did not in fact go away. Apparently he did not intend to do so. Those false stories of the defendant were evidently told to mislead and deceive the neighbors and friends regarding Seefeldt's absence.

The disappearance of Hellmuth Seefeldt dates from the 29th day of August. He was never seen about the premises, or elsewhere, after that day. The neighbors and friends soon became curious and suspicious regarding his absence. The defendant and his family had occupied his home. The defendant's association with the deceased and his continuous occupation of the premises furnished him the opportunity which should have charged him with knowledge of the whereabouts of the deceased. It is not probable that he could have been accidentally killed and buried on his own premises without the knowledge of the defendant. The sudden disappearance of the deceased, the fractured ribs, and the secret burial in a grave in the hollow base of a remote redwood tree, together with the apparent effort to conceal the grave with branches of trees and shoots, indicate that he was un-

lawfully killed by means of violence. The defendant's false and inconsistent stories regarding his absence; his prompt efforts to dispose of the property of the deceased, to secure his bank account by means of forged checks, and his general conduct warranted the jury in concluding that the defendant killed the deceased and secretly buried his body in that secluded grave.

After an absence of several days the mysterious disappearance of the deceased was called to the attention of the officers and an investigation was commenced. They visited the ranch on September 22d, and on several subsequent dates, without discovering the body. Finally a systematic search resulted in the discovery of the hidden grave and recovery of the body. The grave was found in the hollow base of an old redwood tree surrounded by a thicket of bushes and sprouts. It was located one-half mile from the house. The body was found in a shallow grave about twenty inches in depth, over which the earth had been carefully smoothed. It was covered with twigs and branches with the evident purpose of concealing the grave. The body, which was clothed, was badly decomposed. The knees were drawn up and rigid. A post-mortem examination disclosed the fact that he had six lower fractured ribs on the left side. The broken ends of the ribs contained evidence of the presence of dried blood. Doctor Jesse L. Carr testified that "The ribs being broken in a straight line, as they were, and having their margins stained with blood, which was still visible, it indicates that the ribs were broken by force, particularly by force applied at one time or by a single force, and that they were broken during the time that blood was circulating in the body." The doctor further testified that he examined the contents of the stomach and found that it contained undigested food which had been received within two hours prior to death. He also said that the force or violence or blow with an instrument which fractured the six ribs in a straight line was sufficient to have caused the death of the victim, that the limbs which were drawn up to a sharp angle and remained rigid in death indicated that position was caused by great pain as a result of the broken ribs. He asserted that the decomposed condition of the body showed that death occurred from three to six months prior to its discovery. The body of the deceased was absolutely identified as that of Hellmuth Seefeldt by evidence which is entirely satisfactory.

From the foregoing facts, and other circumstances appearing in the record, the jury was warranted in concluding that the defendant murdered Hellmuth Seefeldt and secretly buried him to conceal the crime, and that his motive for the homicide was to secure the money and property of the deceased. Mr. Seefeldt died as a result of violence. He had six broken ribs. The presence of dried blood on the ends of the broken ribs, according to expert medical testimony, indicates that the bones were fractured by violence before his death, and that he died from that cause. The circumstances refute the theory of an accidental death. There was no occasion to conceal his death or to conduct a secret burial of the body if he was merely the victim of an accident. The defendant's opportunity to secure knowledge of the whereabouts of the deceased, his false and fantastic stories regarding his going to the Los Angeles nudist colony or the South Seas, his prompt effort to appropriate the money and property of the deceased, and his general conduct, furnish ample evidence that the defendant was guilty of the crime of murder. The verdict and judgment are adequately supported by the evidence.

We are of the opinion the evidence adequately supports the verdict and the judgment finding the defendant guilty of murder of the first degree. The record contains sufficient proof of the corpus delicti, which may be established by circumstantial evidence. (*People* v. *Ives*, 17 Cal.2d 459 [110P.2d 408]; 13 Cal.Jur. 678, sec. 68; *People* v. *Pruitt*, 55 Cal.App.2d 272 [130 P.2d 767]; *People* v. *Clark*, 70 Cal. App. 531, 545 [233 P. 980].) The burden was on the prosecution to prove the corpus delicti independently of extrajudicial admissions of guilt on the part of the defendant. The elements of corpus delicti, which are required to be shown in a homicide case, are the identity of the body of the deceased and the fact that he was killed by an unlawful agency. (*People* v. *Spencer*, 58 Cal.App. 197, 221 [208 P. 380]; 13 Cal.Jur. 676, sec. 68.) While it is true that the guilt of a defendant charged with murder must be proved beyond a reasonable doubt, it is not necessary that the corpus delicti shall be so proved before the evidence of the defendant's guilt by means of his extrajudicial admissions or otherwise may be received. If a prima facie showing of death by means of an unlawful act is first established, it is sufficient.

(*People* v. *Selby,* 198 Cal. 426, 434 [245 P. 426]; *People* v. *Ives, supra.*) ▮▮▮ In the present case the body of Hellmuth Seefeldt was positively identified. It was proved that he died as a result of violence which caused the fracturing of six ribs in a straight line. It was also shown that his body was secretly buried in the hollow base of a remote redwood tree with the evident purpose of concealing the grave. These facts furnish sufficient evidence of the corpus delicti to render competent the defendant's admissions.

▮▮▮ The subsequent evidence of the defendant's association with the deceased, his conduct, his false stories regarding the disappearance and whereabouts of the deceased and his prompt efforts to appropriate the property of the deceased by the sale of some of his farm and household equipment and the forgery of checks on his bank account warranted the jury in determining that the defendant murdered the deceased and secretly buried his body to hide the crime.

▮▮▮ The record contains sufficient evidence of implied malice to support the verdict and judgment convicting the defendant of murder of the first degree. To sustain a conviction of murder of the first degree it is not necessary to show personal enmity on the part of the defendant toward the deceased. (*People* v. *Fleming,* 218 Cal. 300, 309 [23 P.2d 28]; *People* v. *Sainz,* 162 Cal. 242 [121 P. 922]; 13 Cal.Jur. 591, sec. 11.) Upon a trial for murder, the commission of the homicide by the defendant being proved, the burden rests upon him, in the absence of evidence adduced by the prosecution tending to show that the killing was justifiable or excusable, or that it amounts only to manslaughter, to prove circumstances of mitigation or excuse. (Sec. 1105, Pen. Code; *People* v. *Spinelli,* 14 Cal.2d 137, 142 [92 P.2d 1017].) In the case last cited it is said, quoting with approval from *People* v. *Johnson,* 203 Cal. 153 [263 P. 524]:

" 'The ruthless disposition of the body of the deceased, following the killing, certainly is some evidence as to an abandoned or malignant heart upon the part of the slayer. However this may be, section 1105 of the Penal Code provides that "the commission of the homicide by the defendant being proved, the burden of proving circumstances of mitigation, or that justify or excuse it, devolves upon him, unless the proof on the part of the prosecution tends to show that the crime committed only amounts to manslaughter, or

that the defendant was justifiable or excusable." *The defendant offered no proof to meet the burden which the law casts upon him and as there was no claim of justification or excuse offered for the killing of decedent or pretense that the proof tended to show that the crime committed only amounted to manslaughter, the crime was murder of the first degree.'* " (Italics ours.)

In the present case the defendant did not take the witness stand in his own behalf. He did not admit the killing of the deceased. No contention was made by the defendant either at the trial or on appeal that he was justified or excused, in killing the deceased. It follows that if the killing of the deceased by the defendant has been adequately established, malice is implied under the circumstances of this case sufficient to comply with the provisions of section 187 of the Penal Code. As we have previously said, the evidence of the homicide by the defendant is sufficient to support the verdict and judgment. We must therefore assume it constituted murder of the first degree.

 The appellant contends that the court erred in receiving evidence over his objection of a former extrajudicial admission of the defendant that he forged and cashed the three checks previously mentioned for the aggregate sum of $393, on the bank account of the deceased. It is claimed that admission is incompetent and prejudicial since it tends to prove a separate crime against him which has no bearing on the homicide for which he was being tried. It is true that a prior charge of forgery was pending against the defendant at the time of this trial. But that fact was not disclosed to the jury.

We are of the opinion the court properly admitted the evidence of defendant's forgeries. That evidence was competent in proof of the res gestae and to establish the motive for the homicide. (*People* v. *Green*, 13 Cal.2d 37 [87 P.2d 821]; *People* v. *Northcott*, 209 Cal. 639, 653 [289 P. 634, 70 A.L.R. 806]; *People* v. *Clark*, 201 Cal. 474, 485 [259 P. 47]; *People* v. *Watts*, 198 Cal. 776, 787 [247 P. 884]; *People* v. *Cook*, 148 Cal. 334 [83 P. 43]; *People* v. *Hall*, 27 Cal.App. 2d 440 [81 P.2d 248]; 13 Cal.Jur. 703, sec. 84; Underhill's Crim. Ev., 4th ed., 1094, sec. 559; 1 Wharton's Crim. Ev., 10th ed., 145, sec. 38.) While proof of the motive for the commission of a homicide is not necessarily essential to

support a conviction (13 Cal.Jur. 665, sec. 74), when the defendant denies the killing and the evidence is purely circumstantial, motive for the commission of the crime may become very important and such evidence is competent even though it may disclose other offenses committed by the accused. In 1 Wharton's Criminal Evidence, *supra,* at page 145, it is said in that regard:

"In those cases in which the evidence of the crime charged is for the most part or wholly of a circumstantial character, motive frequently becomes a powerful aid in identifying the accused, and thus connecting him with the commission of the crime. And where, on the trial of a criminal action, evidence is offered which is competent proof of the presence of a motive in the mind of the accused, such evidence is not to be rejected because it also shows, or tends to show, a distinct and different crime."

Likewise, in Underhill's Criminal Evidence, *supra,* at page 1095, it is said:

"Any evidence that tends to show that the defendant had a motive for killing the deceased is always relevant as rendering more probable the inference that the defendant did kill him. . . . Thus, it may be shown that the deceased was possessed of a large sum of money or of personal property, to the knowledge of the defendant . . . and it may be shown that personal property owned by the deceased was found in the defendant's possession, leading to an inference that his covetousness or necessity was tempted."

In the case of *People* v. *Watts, supra,* which is based on circumstances somewhat similar to those of the present case in many respects, the judgment of conviction of murder of the first degree, upon which the death penalty was imposed, was affirmed on appeal. In that case the body of the deceased, Wilfred Hey, was found in a lonely spot in the desert of San Bernardino County. It was identified as the body of Hey. There was no eyewitness to the homicide. The defendant was charged and convicted of the murder. He did not take the witness stand at the trial in his own behalf. It appeared in evidence that the defendant lived in an apartment with the deceased for a period of time in Detroit, Michigan. The defendant was possessed of a British war bond of the value of $1,500. The court said:

"Defendant had lived with Hey in the latter's apartment for some three or four weeks previous to their departure

from Detroit. Through this association it may be inferred that he had an opportunity to acquire some knowledge of Hey's financial affairs.''

Before leaving Detroit the deceased instructed his bank in Detroit to sell the bonds. Later the bank received a telegram, which purported to be from Hey, directing it to transfer the proceeds of the sale of the bonds to a designated Ogden bank, which was done. Upon request from the deceased, the money was later transferred to his credit in the Bank of Italy in Los Angeles. Soon after the date of the alleged murder, the defendant went to the Los Angeles bank, representing himself to be Wilfred Hey. He was identified by his brother as Hey. The bank issued to him a check for the balance of the money belonging to the deceased. He opened an account in the name of Hey and later withdrew the funds. That evidence was adduced at the trial for the purpose of showing motive for the commission of the crime by the defendant. The court said in regard to that evidence:

''His brazen effrontery in boldly representing himself as Wilfred Hey when he secured from the Bank of Italy the proceeds of the British war bonds clearly indicates an utter absence of that fear of detection which he must have felt did he not know that the body of the man he was impersonating lay rotting on the desert sands. In the light of these circumstances the determination of the jury is conclusive upon this court.''

In the present case the association of the defendant with the deceased gave him the opportunity of learning of his financial affairs, including the possession of the bank account. His conduct in promptly disposing of some of the property of the deceased, and his bold attempt to procure his bank funds by forgery, together with his false stories regarding the whereabouts of the deceased furnish satisfactory evidence that he killed Hellmuth Seefeldt, and that he thought his body was safely concealed in the hollow base of the redwood tree where it would not be discovered. We conclude that the evidence of the forgeries was competent. The court did not err in receiving that evidence over objection of the defendant.

For the reasons above stated the motion for a new trial was also properly denied.

The judgment and the order are affirmed.

Peek, J., and Adams, P. J., concurred.