[Crim. No. 1961. Third Dist. June 7, 1946.]

THE PEOPLE, Respondent, v. CARLOS TOPETE DUENAS, Appellant.

George E. Foote for Appellant.

Robert W. Kenny, Attorney General, and James O. Reavis, Deputy Attorney General, for Respondent.

THOMPSON, J. — The defendants were jointly charged and tried by a jury for the crime of murder. They were represented by separate counsel. A verdict of manslaughter was rendered against each. The defendant, Carlos Topete

Duenas, moved for a new trial, which was denied. The co-defendant, Cuevas, has not appealed. From the judgment and order denying a new trial this appeal was perfected by the defendant Carlos Topete Duenas.

It is contended that the verdict and judgment are not supported by the evidence; that the prosecution failed to prove the corpus delicti, and that the court erred in refusing to give to the jury two instructions regarding the proof which is necessary to convict an accused person as an accessory to a crime.

The defendants were friends. They lived in Sacramento. The appellant was unmarried. The wife and family of the codefendant, Cuevas, live in Mexico. At about 9 or 10 o'clock on the night of July 16, 1945, the defendants went together to the Nordeste Club on N Street in Sacramento, where they ate a meal. At 11:30 o'clock that night, Rosendo Meza and his wife, Irene, who live at Vina, eighteen miles from Chico, arrived at the club.

They went there with the deceased, Edwin Chabez, and a woman by the name of Jane, with whom he was living. They were seated at the bar. Mrs. Meza is a niece of Jane. The defendants were first seated at a table in the same room. They went to the bar and ordered beer to drink. There is a conflict of evidence regarding the identity of the defendant who offended Jane by pouring some beer upon her, but she testified that the appellant, Carlos Duenas, whom she identified as "the man in the blue shirt," offered her a drink, which she refused, and that he then poured the beer on her leg. That incident started a quarrel between the men of the respective parties. Mr. Nordeste, the proprietor of the club, stopped the argument by saying to the defendants, "You better leave, you have to go." The defendants then left the club and crossed the street, remaining on the sidewalk on the opposite side of the street beyond a parked car, for several minutes, until Mr. Meza, Edwin Chabez, the deceased, and the women emerged from the building. Regarding the affray which then followed, there is a serious conflict of evidence, even between the defendants themselves.

Regarding the actual affray, Rosendo Meza testified to the spilling of beer on the person of Jane Chabez, the quarrel which resulted therefrom, and the departure of the defendants at the request of the proprietor. Mr. Meza then said "They [the defendants] went across the street and they waited there for us to come out"; that "we stayed there about a half an

hour more and it was 12:00 o'clock. We came out together, . . . Eduardo Chabez, Jane, Irene and myself." The witness said they were walking on Third Street toward Capitol Avenue, when the defendants came toward them, cursing them and demanding that they "come out and fight." He said that Chabez then "gathered a piece of stick that was near a fence and he went to the middle of the street"; that both of the defendants were then in the middle of the street, and that the "taller man had . . . a piece of stick; a broom handle or something." He then testified that the appellant, Duenas, who was identified by the witness in the courtroom, struck Chabez [with] a knife, and that the deceased fell and was lying on the street, and that "He ran, that man." On cross-examination the witness was asked "Did you or did you not see Duenas have a knife in his hands that night?" to which he replied "Yes, I did see it." The witness then picked up the wounded man and assisted him to walk toward the sidewalk. He said Chabez was unable to walk and that he "then sat down on the street." The witness said "I saw his pants full of blood and he asked me to call a car *because he was already cut.*" A cab was called and Chabez was taken to the hospital, and died the following day, as the result of that wound.

Doctor John Kassis testified that he performed an autopsy on the body of the deceased and that he died as the result of a wound near the left groin which severed the femoral artery. He said "it was about a half inch cut . . . three inches deep." He said that the artery was cut and that the deceased bled to death from that wound.

Jane Chabez corroborated much of the material testimony of the witness, Rosendo Meza. Irene Meza testified that both defendants "were together" in the street at the time of the affray; that she saw "this man Duenas . . . bending over Edward;" that "the short guy . . . had a knife in his hand." She admitted that she did not see the fatal blow struck but said, "when I followed him up . . . he had a knife in his hand." She said that both defendants came across the street toward them when they came out of the club; that she saw "both these men close to him [the deceased] . . . they were very close to him," and that the shorter man (Duenas) had a knife in his hand. She also testified that after Chabez fell down, both defendants "ran . . . around the corner toward Fourth on N."

The codefendant, Cuevas, contradicted the appellant's claim that he was not present during the affray but stood sixty paces or more away. Cuevas testified that after they left the club and crossed the street they remained on the sidewalk a few minutes and that Duenas asked him to return with him to the building so that he could pay for the drink which he had ordered; that they then crossed the street together; that they did not then enter the building, but the deceased and his party soon came out, and Chabez armed himself with a club. The witness admitted that he also picked up a stick. The witness testified that when they saw the people coming out of the saloon, Carlos Duenas ''crossed the street first and followed them''; that the deceased had the stick in his hand, and when he stepped off the sidewalk he hit Duenas, breaking the stick. He said that Chabez then ''fell down and rolled over to the middle of the street.'' The witness denied that either he or Duenas had a knife or that they used one in that affray. He did testify that Chabez was armed with a knife. He said that after the incident ''Duenas told me, 'Come on, let's go, *because I have stuck him,*' and then we walked together on the street and turned the corner and went away.'' The defendants then went to a restaurant and ate another meal together. They were subsequently arrested and jointly tried for the crime of murder. Each was convicted of manslaughter.

The corpus delicti was sufficiently established. The elements necessary to be proved in a homicide case to establish the corpus delicti are merely to identify the body of the deceased, and to show that he was killed by means of an unlawful agency. (*People* v. *Spencer,* 58 Cal.App. 197, 221 [208 P. 380]; *People* v. *Cornett,* 61 Cal.App.2d 98, 105 [141 P.2d 916]; 13 Cal.Jur. § 68, p. 676.) In the present case, the physician who performed the autopsy testified that Chabez died as the result of bleeding to death from an artery which was cut by a sharp instrument; that the wound was near the groin and it was half an inch wide and three inches deep. That wound indicated that it was inflicted by a knife. Three witnesses saw a knife in the hands of the appellant at the time of the affray. On cross-examination the doctor did answer the question, ''It could have been caused by a stick?'' by replying, ''Yes.'' There is evidence that the deceased had a stick in his hand, but our attention is not called to any evidence indicating that it had a sharp point which could have

inflicted that wound. Evidently the jury did not think so. There is an abundance of evidence to satisfactorily show that the deceased was cut while he was engaged in the affray with the appellant, Duenas. Chabez then fell down, and he said "he was already cut." It is highly improbable that he was cut in any manner other than by means of the knife which was seen at that time in the hands of the appellant.

The evidence adequately supports the verdict and judgment of conviction of manslaughter. It is true that, upon cross-examination of the witness Meza, it appeared from the transcript of his preliminary examination that he had made statements contradictory of his testimony at the trial, with respect to his claim that he had seen a knife in the hands of the appellant at the time of the affray, and possibly regarding some other essential incidents of the conflict. That evidence was offered for the purpose of impeachment. We must assume that the jury, under proper instructions, gave full consideration to that impeachment evidence. The question of the weight of the evidence was exclusively within the province of the jury. We may not interfere with that province. The testimony of other witnesses corroborates his statement at the trial that the appellant did have a knife in his hands at the time of the affray.

The chief contention of the appellant is that he was not present when the conflict occurred. He claims that he was sixty paces or more away from the scene. But that claim is refuted by all of the other witnesses, including his codefendant. Cuevas not only testified that Duenas was present and that he was hit by a stick in the hands of Chabez just prior to the time the deceased fell to the ground, but he also said that Duenas then said to him, "Come on, let's go, because I have stuck him." Regardless of the conflict of evidence and of the apparent conflicting statements of the witness, Rosendo Meza, we are satisfied there is ample evidence to support the judgment of conviction of the appellant of the crime of manslaughter.

A witness may be impeached by evidence that he has made, at other times, statements inconsistent with his testimony given at the trial. (Code Civ. Proc., § 2052.) When a witness is successfully impeached, the jury may disregard his testimony. (*People* v. *Phillips,* 70 Cal. 61, 69 [11 P. 493].)

But the fact that a witness made statements at another

time which were contradictory of his testimony given at a trial, does not necessarily require the jury to reject his entire testimony. Such impeaching evidence is received only for the purpose of testing his credibility. The weight of such impeaching evidence is solely a question for the jury or the trial judge. (*Goodwin* v. *Robinson*, 20 Cal.App.2d 283, 288 [66 P.2d 1257]; 27 Cal.Jur. § 156, p. 182; 70 C.J. § 1338, p. 1152.) It is not the privilege of the reviewing court to pass upon the weight or effect of impeaching evidence, or the weight to be given to the testimony of a witness at the trial, unless his evidence clearly appears to be inherently improbable, which we may not hold to be the fact under the circumstances of this case. The witness, Meza, denied at the trial that he had previously stated he did not see a knife in the hands of the appellant, Duenas. At the trial, he positively asserted that he did see the knife in the hands of the appellant. That fact was corroborated by two other witnesses. The proceedings at the preliminary hearing indicates that Rosendo Meza did state that he did not see a knife in his hands. At the trial he insisted that he did see the knife in his hands. The defendants were strangers to the prosecuting witnesses. The evidence satisfactorily shows that one of the defendants cut the deceased with a knife. It indicates that the appellant cut the deceased. Since they were both engaged in the affray it is immaterial which one actually used the knife. It is not surprising that there may have been some confusion on the part of the witness in identifying the defendant who was seen with the knife in his hands. The credibility of the witness and the weight to be given to the impeachment testimony were exclusively the province of the jury.

The court properly instructed the jury, pursuant to section 2052 of the Code of Civil Procedure, that a witness may be impeached by evidence that he has made, at other times, statements inconsistent with his testimony at the trial. It was also instructed that the jury has the sole discretion to determine the weight of the evidence and the credibility of witnesses and that when a witness has wilfully sworn falsely upon a material issue that his entire evidence may be distrusted or rejected. Those instructions amply protected the appellant's rights. The jury could not have been misled upon that principle of law.

The appellant failed to show that the rejected instructions upon the subject of aiding and abetting the com-

mission of the crime were prejudicial. We must assume in support of the verdict and judgment that the two rejected instructions were adequately covered by other proper instructions which were given to the jury. (*Podesta* v. *Delucchi*, 100 Cal.App. 249 [279 P. 1061]; *Goldman* v. *Dahlberg*, 79 Cal. App. 380 [249 P. 536]; 2 Cal.Jur. § 509, p. 869.) The record discloses the fact that the first asserted omission was actually given to the jury in almost the exact language contained in appellant's proffered instruction, and that appellant's instruction number seven was adequately covered by other instructions which were given to the jury.

The appellant assigns the alleged refusal of the court to give to the jury his proposed instructions numbers one and seven as prejudicially erroneous. They are based on the provisions of section 31 of the Penal Code, which declares that all persons concerned in the commission of a crime are deemed to be principals, whether they directly commit the act constituting the offense, or "aid and abet in its commission." That instruction was given to the jury. The appellant is mistaken in asserting that his instruction number one was refused. It was given to the jury in the following language:

"For one person to abet another person in the commission of a criminal offense, simply means, to knowingly and with criminal intent, aid, promote, encourage or instigate, by act or counsel, or by both act and counsel, the commission of such criminal offense."

Since the appellant had testified that he was not present at the time of the affray, and upon the contrary that he then stood at a distance of sixty paces or more away from the place where it occurred, the court fully and fairly instructed the jury upon the necessity of corroborating the testimony of an accomplice, and defined that term in the language of section 1111 of the Penal Code.

The appellant does not complain of the refusal to give several of his proffered instructions which were drawn on the theory that he was not present at the time of the affray. We assume that is because all of the other witnesses, including the codefendant, Cuevas, testified that he was present. The evidence is very convincing that the appellant was present and that he participated in the affray.

The appellant's instruction number seven, which was refused, is inconsistent with his testimony that he was not present. It merely states that it is not sufficient to prove that a

defendant is present and has the opportunity to commit the offense, but that the prosecution must prove that he "aided, promoted, encouraged and instigated by act or counsel or by both act and counsel, the commission of such criminal offense." The essential language of that refused instruction was included in the foregoing quoted instruction which was given to the jury. The court further fully instructed the jury that the burden was on the prosecution to prove every essential element of the crime beyond a reasonable doubt, and that if a doubt remained in the minds of the jurors as to the guilt of the accused, it was their duty to acquit the defendant. We are convinced that the defendant was not prejudiced by the refusal to give instruction number seven.

Moreover, the evidence satisfactorily shows that the appellant participated in the controversy and in the affray as a principal whether he or his codefendant actually stabbed the deceased. There is no miscarriage of justice.

The judgment and the order are affirmed.

Adams, P. J., and Peek, J., concurred.