[Crim. No. 5178.   Second Dist., Div. Two.   Dec. 20, 1954.]

THE PEOPLE, Respondent, v. LUIS J. LEON et al., Defendants; JIMMY CARROLL, Appellant.

Lowell Lyons for Appellant.

Edmund G. Brown, Attorney General, Clarence A. Linn, Assistant Attorney General, and Victor Griffith, Deputy Attorney General, for Respondent.

FOX, J.—The district attorney filed an information accusing Luis J. Leon and Jimmy Carroll of a violation of Penal Code, section 187, in that on August 8, 1953, they murdered

Vincent M. Ortiz. The case was tried before a jury which returned a verdict finding both defendants guilty of murder in the first degree, and fixed the penalty at life imprisonment. Carroll appeals from the judgment of conviction and from the order denying his motion for a new trial.

Vincent M. Ortiz owned and operated a pharmacy on the corner of Gage Avenue and Hammel Street (5800 Hammel) in Los Angeles. On the morning of August 8th, when Mr. Ortiz left his home to go to his drugstore, he had in his possession a smooth, tan leather wallet.

The Ortiz pharmacy was divided into two portions; the front portion contained the soda fountain, stools, display windows and counters; the rear portion of the store was separated from the front section by a wall and swinging doors. There were two cash registers in the drugstore, one on the west end of the soda fountain and the other on the rear counter. Carroll met his codefendant, Leon, at Chiquita's Cafe on South Soto Street, Los Angeles. They spent the day driving around the East Los Angeles district in Carroll's car. During the course of their travels in the evening they passed the Ortiz pharmacy. Having observed there was only one man inside, they returned at once to the pharmaceutical establishment. They parked in the rear, on Hammel Street. Both Carroll and Leon entered the drug store. Leon led the way with Carroll a few feet behind. When the latter turned to look out of the door to see if anyone was approaching he heard a shot. Ortiz, who was on the opposite side of the counter from Leon, began to run toward the rear. Carroll started to run out of the drug store, but Leon called him back. He returned, climbed over the counter, and looked into the rear part of the store where he saw Leon standing near Ortiz who was lying on the floor. He heard Ortiz ask Leon to get him a doctor, quick. But Leon did nothing and made no reply.

Leon ordered Carroll to get the money from the cash registers. When the cash register on the rear counter failed to open, Carroll advised Leon of his difficulty and the latter, with a handkerchief in his hand, opened it. Carroll took the money out of this cash register and proceeded to the other at the soda fountain from which he took all the paper money and part of the silver. He then left the store and returned to his car. In a few seconds Leon followed and the two men drove away.

While defendants were leaving the scene, Carroll saw Leon take some money out of a light tan wallet which he knew did not belong to Leon. Defendants drove to Ramona Gardens where Carroll's girl friend, Alice, lived. There defendants split the proceeds of the Ortiz robbery, each getting approximately $46. Leon there disposed of Ortiz's wallet by throwing it into the incinerator.

At approximately 11 p.m., on August 8th, Mary Torres, who was visiting her mother who lived on Hammel Street, directly to the rear of the Ortiz drug store, saw a car drive up and park in front of her mother's home. The car did not have its headlights on. A few minutes later Mary heard a gun shot which she thought came from the corner drug store. On looking out the window she saw two men approaching the parked car from the drug store. Although she gave a general description of the men, she was not able to identify either of them.

Shortly after 11 p.m., Rudy Gutierrez went into the Ortiz drug store to buy some cigarettes. There was no one in the front part of the store. After waiting, he knocked on a table, but no one came. As he stood there reading the paper two other men entered. When a further knocking failed to bring any response the three men went to the rear of the drug store where they found Ortiz lying face down on the floor, apparently dead. He was wearing a druggist's smock which was turned up over the belt line; his left rear pants-pocket was partially turned out; his wallet was gone. There was blood on the smock and on the floor. There was a hole in the smock which appeared to have been made by a bullet. An autopsy by Dr. Newbarr revealed that Ortiz had been shot in the chest, the bullet, which was retrieved, passing through the heart. There was no evidence of powder burns on the victim or alcohol in his blood. While the doctor could not tell whether or not the wound had been self-inflicted, it was his opinion that the victim would have been in an awkward position to shoot himself. It was the opinion of an expert from the sheriff's crime laboratory that the gun had to be at least 30 inches from the smock in order not to leave powder burns on it. No gun was found on the premises and Mrs. Ortiz testified her husband never kept any firearms at his store.

Carroll was arrested at his home on October 2, 1953, at approximately 5:30 p.m. That evening he made a complete confession, which was taken down by a statement reporter, in which he related all the details of the Ortiz murder and

robbery. He then directed the officers to 1048 South Soto Street, pointing out the Chiquita Café where he had stated he and Leon met on the eventful day. He also told them the location of the drug store. The next day Leon, after being advised by Carroll that he had told the officers about the Ortiz affair, also made a detailed confession, which was taken down and read to the jury, as was Carroll's statement. Leon claimed that "the druggist had made a grab for the gun and the gun had gone off;" he admitted, *inter alia,* that he removed the wallet from the pocket of the man on the floor; that he opened the cash register for Carroll; and that after leaving the drug store they went to the home of Carroll's girl.

That same day Deputy Sheriff Jones received a .32 caliber chrome colored revolver from Mrs. Josie Perez. The officer then held a conference with Carroll, Leon, Leon's uncle—Carnacion Ramirez—and a man identified as Diaz. Officer Jones showed the gun to Leon and asked him if that was the gun he used to shoot Ortiz. Leon glanced at the gun and answered: "Yes." Leon was asked how he recognized the gun, and he replied: "Well, if you look on the side there will be a slightly rusty spot on the side." The officer turned the gun over, and Leon indicated a place just beneath the hammer where the nickel plate had corroded. Leon said he gave the gun to his uncle Carnacion Ramirez who turned it over to Diaz and that the latter pawned it to Mrs. Josie Perez for $10.

This weapon was delivered to Mr. Lacy of the sheriff's crime laboratory. The bullet removed from the body of Ortiz by the autopsy surgeon, Dr. Newbarr, was also turned over to Mr. Lacy. He fired test shots from the gun and compared the slugs with the bullet received from Dr. Newbarr. As a result of his comparisons, Lacy was of the opinion that the bullet which Dr. Newbarr removed from Ortiz had sufficient characteristics to identify it as having been shot from Leon's gun.

Appellant's first point is that "The circumstances were entirely inconsistent with guilt and were consistent with innocence and the court erred in accepting them as consistent with guilt." The simple answer to this point is that the facts are in no way inconsistent with guilt. ▮ The evidence which the jury accepted as true was ample to establish that Carroll was a participant in the Ortiz robbery and shooting, and since Ortiz was killed during the perpetration of a robbery he was guilty of murder in the first degree. (Pen. Code,

§ 189.[1]) True, Carroll did not pull the trigger, Leon having fired the fatal shot. But, because of Carroll's active participation, he was properly classified as a principal (Pen. Code, § 31[2]) and therefore equally responsible. A mere reading of the sordid story which we have summarized completely demonstrates the lack of merit in appellant's position.

Appellant's second point is that the court erred in failing to instruct the jury as to second degree murder. There was no basis for such an instruction in this case. The evidence established that the homicide took place during the perpetration of a robbery. It was therefore murder in the first degree. (*People* v. *West*, 215 Cal. 87, 93 [8 P.2d 463]; Pen. Code, § 189.) There was no evidence in the case which would have justified a verdict of murder in the second degree. "It was not error to refuse an instruction as to second degree murder where the evidence shows that, if guilty at all, the defendant was guilty of murder in the first degree." (*People* v. *West, supra*; *People* v. *Rogers*, 163 Cal. 476, 482-483 [126 P. 143].) In this connection appellant relies on *People* v. *Perkins*, 37 Cal.2d 62 [230 P.2d 353]. That case deals with eligibility for probation, under the 1949 amendment to Penal Code, section 1203, of a party who was convicted of participating in a robbery with other defendants who were armed but who was not "himself" armed with a deadly weapon. While the court holds that such defendant was not thereby rendered ineligible to probation it points out that the fact he was unarmed "does not make him any the less, in a legal sense, guilty of robbery in the first degree . . ."[3] and that he was "guilty of first degree robbery, regardless of the precise acts which he committed personally, because he aided and abetted in its commission (Pen. Code, § 31)." Such is the identical situation in the instant case. Carroll was guilty of murder of the first degree, regardless of the acts which he committed personally, because Ortiz was murdered by appellant's confederate while they were perpetrating a robbery. (Pen. Code, § 189.)

---

[1]Penal Code, section 189, reads in part: "All murder which is . . . committed in the perpetration or attempt to perpetrate . . . robbery, . . . is murder of the first degree; . . ."

[2]Penal Code, section 31, reads in part: "All persons concerned in the commission of a crime . . . whether they directly commit the act constituting the offense, or aid and abet in its commission, . . . are principals in any crime so committed."

[3]Penal Code, section 211a, reads: "All robbery which is perpetrated by torture or by a person being armed with a dangerous or deadly weapon is robbery in the first degree."

■ Appellant's final point is that the evidence is insufficient to establish the corpus delicti apart from his admissions and confession and those of his partner in this criminal venture. There is no merit in this point. ■ The elements of the corpus delicti, which must be shown in a homicide case, are: (1) the identity of the body of the deceased; and (2) the fact that he was killed by an unlawful or criminal agency. (*People* v. *Cornett*, 61 Cal.App.2d 98, 105 [141 P.2d 916].) ■ There is no question about the identity of the victim, Mr. Ortiz. That he was killed by an unlawful or criminal agency finds ample support in the evidence and the reasonable inferences therefrom. Dr. Newbarr testified that Ortiz died as a result of a gun shot through the heart; that for the wound to be self-inflicted would have required Ortiz to assume an awkward position. The absence of powder burns on his smock, the distance the gun would have had to be from his body to avoid such tell-tale marks, and the fact that he kept no gun at his drugstore and that none was found at the scene after the shooting are indeed significant. Also, Mary Torres heard the shot which came from the direction of the drugstore, and then saw two men, coming from that direction, enter a car which had been parked in front of her mother's house. There was evidence that Ortiz had been robbed and that his wallet was missing. The ballistic expert, Mr. Lacy, expressed the opinion that the bullet which had been removed from Ortiz's body was fired from the gun that had belonged to Leon and which was produced by Mrs. Perez. This independent evidence is ample to fully establish the corpus delicti and at the same time to negate the possibility that Ortiz committed suicide.

The judgment and order are affirmed.

Moore, P. J., and McComb, J., concurred.