[Crim. No. 1889. Third Dist. May 1, 1945.]

THE PEOPLE, Respondent, v. M. A. THOMPSON, Appellant.

82

Wallace Shepard, R. C. Fleming, E. R. Vaughn and John
W. Brannely for Appellant.

Robert W. Kenny, Attorney General, James O. Reavis, Deputy Attorney General, John Quincy Brown, District Attorney, and Albert H. Mundt, Chief Deputy District Attorney, for Respondent.

THE COURT.—The defendant was convicted of abortion under the provisions of section 274 of the Penal Code. From the judgment of conviction and from the order denying his motion for a new trial he has appealed.

The appellant has assigned as grounds for reversal of the judgment: That there was a failure to adequately prove the corpus delicti; that the court erred in admitting prejudicial evidence with relation to four exhibits which were merely marked for identification without having been formally admitted in evidence for all purposes; that the court erred in permitting the cross-examination of the defendant upon matters not

testified to in his examination in chief; and that the court erred in overruling objections to questions propounded on cross-examination to a character witness tending to indicate that he might be guilty of other offenses.

■ The judgment is adequately supported by the evidence. The record shows that the defendant was a licensed chiropractor who maintained offices in Sacramento, and that a seventeen-year-old girl who was pregnant went to his office. She testified that she visited the office of defendant and told him she had been pregnant six months and wanted to procure an abortion, and that he agreed to handle the case for the sum of $100; that, in the company of a lady friend, she returned by appointment, for treatment on the 29th of May, 1944, and that she paid the defendant $100 before he treated her. The doctor directed her to enter a room where she saw an operating table equipped with stirrups, an electrical machine and attachments, a cabinet, sink and other furnishings. She was instructed to disrobe and to recline on the table. After doing so the doctor entered and covered her with a sheet. She saw "a black pad" attached to "a little black cord." That pad was evidently the urethral olive electrode set which was connected with the electrical machine and used in the operation. The doctor placed that electrical pad over the patient's stomach and inserted in her vagina a metal speculum, which she afterward saw in his hands, with which he distended the walls, and then switched on the machine. The patient testified that she heard "a sort of clicking of metal against metal" and that "the machine was turned on before I heard the metal and then afterwards it buzzed and clicked and went off." She declared that she felt the sensation of "a tingling from the pad." After the first treatment was completed the patient left with her friend in a cab. That treatment did not result in a miscarriage. Several days later she called the defendant on the telephone and told him "there had been no results" and made an appointment for another treatment at his office on June 5th. She said, "I had another treatment the same as before." As a result of that second treatment she said "I had labor pains all day. . . . After work, about 4:30, . . . the water broke." That night she left her home and spent the night at the apartment of her lady friend. About ten o'clock that night she called Dr. Thompson and told him of her condition. He called, and after examining her, he told her she

"should have a baby that night or the next day." He said he would call again the next morning. He also warned her "not to mention anything" about the treatment. The doctor called the next morning and found her suffering severe labor pains, and arranged for her accommodation at a local hospital. She went to the hospital and told them at his suggestion, that Dr. Thompson had sent her there, and that she had fallen off a motorcycle. Dr. Ross M. Grimm, a duly licensed physician, examined her and testified that "she was pregnant and having contractions;" that she had been pregnant about six months, and that she was about to prematurely abort the foetus; that the girl was healthy and did not require an abortion to preserve her life or health. Dr. Grimm procured the delivery of the child which was born alive but lived only about twelve hours when it died.

Following the delivery of the child, the patient's grandmother, having secured the name and address of Dr. Thompson, called him on the telephone to locate her granddaughter and to inquire regarding the cause for sending her to a hospital. The family did not know that the girl was pregnant. The doctor told the grandmother that the girl was "in a terrible nervous condition" and that he had to send her to the hospital. He admitted that he had "talked the girl out" of telling her mother she was going to a hospital. When the grandmother informed him she had told the girl's mother that her daughter had been sent to the hospital the doctor replied, "Now you have gone and spoiled everything; she will go out there and spoil things. . . . You damned women talk too much; . . . You know I am not a physician."

Doctor H. P. Huppert, a licensed physician who had experienced many years in the practice of obstetrics, testified in detail regarding the use of the electrical machine, equipment, speculum and urethral olive pad which were identified as the articles taken from the defendant's office and which were used in his treatment of the patient. Doctor Huppert stated that the urethral olive pad was used in connection with the electrical machine. He asserted that an abortion could be procured by means of that equipment used in the manner related by the patient.

Verna Shermer, who was employed in Dr. Thompson's office as a nurse for several months prior to the middle of March, 1944, testified that she saw the doctor performing a few vaginal treatments. She identified exhibit number 1, the black

electrical machine number 2, and the urethral olive electrode set, which she said was a part of the electrical machine equipment and which she had seen used in his office "a couple of times." She said that the pad was placed on the stomach, just as the patient testified that it was used in this case.

Upon the foregoing evidence, together with other corroborating circumstances, the defendant was convicted of abortion upon two counts of the information.

The support of the judgment depends largely upon the veracity of the chief participants in the alleged crime. The defendant positively denied that he ever treated the prosecutrix at any time for any purpose. There is evidence of conduct on his part which refutes that statement. The girl's story of the abortion appears to have been adequately corroborated. The credibility of witnesses and the weight of the evidence were questions for the determination of the jury with which we may not interfere since there is substantial evidence to support its conclusions. We are satisfied the verdict and judgment are supported by the evidence.

In his closing brief, for the first time, the appellant argues that the corpus delicti was not established. It is the settled rule that when an assigned error is neither argued nor supported by authorities on appeal, it will be deemed to have been abandoned. (*People* v. *Mott*, 211 Cal. 744 [297 P. 23]; *People* v. *Epstein*, 21 Cal.App.2d 488 [69 P.2d 454]; 8 Cal. Jur. § 550, p. 546; 24 C.J.S. § 1813, p. 642.) It is apparent that the urging of alleged error for the first time in appellant's closing brief affords the prosecution no opportunity to reply to that contention. We shall however dispose of that issue on its merits.

We are satisfied the corpus delicti was adequately established in this case. It is true that a defendant may not be convicted of abortion on the uncorroborated testimony of the woman upon whom the alleged crime is committed (Pen. Code, § 1108), or by the uncorroborated testimony of an accomplice. (Pen.Code, § 1111.) It is also true that the corpus delicti must be proved by evidence independently of extrajudicial admissions or confessions of the defendant. (*People* v. *Cornett*, 61 Cal.App.2d 98, 105 [141 P.2d 916]; 8 Cal.Jur. § 248, p. 167; 1 Cal.Jur. § 11, p. 113; 127 A.L.R. 1131, note.) But the testimony of the female upon whom the alleged abortion is committed, or the testimony of an ac-

complice, may be considered in support of proof of the corpus delicti, provided such evidence is adequately corroborated by competent facts, circumstances or reasonable inferences to be drawn from the evidence. (*People* v. *Wilson,* 25 Cal.2d 341 [153 P.2d 720]; *People* v. *Hoyt,* 20 Cal.2d 306, 314 [125 P.2d 29]; *People* v. *Richardson,* 161 Cal. 552, 563 [120 P. 20]; *People* v. *Siderius,* 29 Cal.App.2d 361 [84 P.2d 545]; *People* v. *Frazer,* 80 Cal.App. 464 [252 P. 633]; 8 Cal.Jur. § 248, p. 167.) ■ While it is true that the essential elements of the crime must be corroborated, it is necessary only to supply sufficient proof thereof to entitle the cause to be submitted to the jury for determination. (*People* v. *King,* 213 Cal. 89, 108 [1 P.2d 15]; 1 Cal.Jur. §11, p. 113.) ■ It is the province of the jury to pass upon the weight of evidence and to determine, on the merits of the cause, whether the essential elements of the crime have been proved beyond a reasonable doubt. Regarding the sufficiency of corroborating evidence to meet the requirements of sections 1108 and 1111 of the Penal Code, the Supreme Court said in the Wilson case, *supra,* at page 343:

"So long as corroborating evidence creates more than a suspicion of guilt, it is sufficient even though it 'be slight and, when standing by itself, entitled to but little consideration.' (*People* v. *Negra,* 208 Cal. 64, 69 [280 P. 354]; *People* v. *Dorrance,* 65 Cal.App. 2d 125, 130 [150 P.2d 10]; *People* v. *Shaw, supra* [17 Cal.2d 778 (112 P.2d 241)], at p. 802.) It may consist of testimony of the defendant and inferences therefrom as well as inferences from the circumstances surrounding the criminal transaction. [Citing authorities.]"

■ The extrajudicial statement of the defendant was admitted in this case without objection. The testimony of the prosecutrix is clear and convincing upon every necessary element of the offense. It is adequately corroborated. Her lady friend loaned her $100 which she testified she paid to the defendant to perform the abortion. That friend also said that she accompanied the girl to the office of the defendant twice about the time of the treatments. Dr. Grimm testified that the girl came to the hospital pregnant and in severe labor pains; that she delivered a six-months-old child which lived but twelve hours and then died. Dr. Huppert testified that the instruments coming from the defendant's office, which were exhibited to him, could be used to procure an abortion in the manner disclosed by the evidence. The defendant took the

witness stand and denied that he ever treated the girl in any manner at any time, although he admitted that she came to his office twice to procure an abortion. He also admitted, as a witness, that he visited the apartment the day following the last alleged treatment, and found her suffering severe labor pains, and that he then sent her to a hospital. That admission is inconsistent with his claim that she was not his patient. The reasonable inference is that she was his patient and that he had previously treated her. The foregoing evidence furnishes adequate proof of the corpus delicti, and sufficient corroboration to meet the requirements of sections 1108 and 1111 of the Penal Code.

█ The appellant charges prejudicial error in receiving evidence regarding the use of certain instruments which were seized from defendant's office by means of search warrants and claimed to have been used by him in performing the alleged abortion, without having first introduced them in evidence. There were ten exhibits which were brought into court. Each was marked for identification. They consisted of a vaginal speculum, an electrical machine together with electric cords, containers and pads, an electrode olive pad and set, an operating table, a page from the doctor's appointment book and an extrajudicial statement of the defendant. Each of said instruments and attachments was duly received in evidence and marked as an exhibit, including the principal electrical machine and the operating table. The appellant does not challenge the evidence with respect to any of the exhibits except four which were numbered 1, 4, 8 and 9 "for identification." The first one was formally and properly received in evidence "for all purposes" as we shall hereafter indicate. The other three consisted of the electrode olive pad and set and an electric cord and pads with their containers which were designated, explained and marked for identification, but which the prosecuting officer neglected to formally offer in evidence for all purposes.

We think that omission was harmless. (*People* v. *Owen,* 68 Cal.App.2d 617 [157 P.2d 432].) Those articles were apparently a necessary part of the electrical device and machine which was received in evidence, by means of which the abortion was procured.

█ The first challenged exhibit number 1 is a vaginal speculum. It was sufficiently identified by the prosecutrix.

88

She testified that she saw an instrument "resembling . . . that, . . . in Dr. Thompson's hand," in his office immediately after his first treatment. She also testified that he used some instrument in the course of his treatment in the same manner that Dr. Huppert subsequently testified the speculum could be used in such an operation. It was first marked Exhibit 1 for identification. The use of that instrument was testified to without objection. The attorney for the defendant fully interrogated the doctor on cross-examination regarding the use of that instrument. Much later, in the course of the trial, after Melvin Reese, a deputy sheriff, had testified that he took that instrument and the other exhibits from the defendant's office by means of a search warrant, the speculum was offered "for all purposes," and we think it was actually received in evidence. This colloquy occurred in that regard:

"Mr. Mundt: At this time I want to introduce this speculum, People's Exhibit 1 for identification, *for all purposes.*

"Mr. Shepard: To which we object, . . .; no proper foundation laid.

"The Court: I don't think you have proven that sufficiently.

"Mr. Mundt: We have the testimony of the girl that an instrument similar to that . . . was used in the abortion.

"The Court: Did she say that?

"Mr. Mundt: [An instrument] similar to this [was seen] in his hand, . . . .

"The Court: Very well. Proceed."

After refreshing the court's mind regarding the evidence in that respect, the court clearly overruled the objection and admitted the vaginal speculum in evidence for all purposes. There certainly was no error in receiving that instrument in evidence.

 There was no prejudicial error in failing to finally ask for the admission in evidence of exhibits numbers 8 and 9 for identification. They consisted of an electric cord and pad together with containers. They had not been referred to until defendant's cross-examination of Mr. Reese, the deputy sheriff, regarding the seizure of the several instruments under search warrant. He was asked by defendant's attorney if he had mentioned all articles that he seized under that warrant. He replied that he also took the electric cords and the containers and pad. At the request of the district attorney they were then marked for identification, without objection on the part

of the defendant. We are directed to no evidence that the electric cords, containers and pad were again referred to or displayed before the jury. We are unable to perceive how the failure to formally introduce them in evidence could have prejudiced the defendant. If they were a necessary part of the electrical machine which was used in the performance of the abortion we are of the opinion they may be considered to have been received in evidence when that machine was received and formally marked as an exhibit for all purposes. If they were not a part thereof it was harmless that they were not formally received in evidence.

The appellant chiefly urges the alleged erroneous rulings of the court permitting the urethral olive pad and electric cord to be marked exhibit 4 for identification, and in admitting testimony regarding its use. Mr. Reese, the officer, testified that he obtained it from the office of the defendant. He said that he first asked the defendant if he had that equipment, and that he replied "No." The girl upon whom the abortion was committed sufficiently identified it as a part of the electrical apparatus which was used in the performance of the abortion. She testified there was an operating table and an electrical machine in the office room where the treatments were administered; that the machine was placed against the wall about three feet from the table upon which she reclined; that the doctor placed "on my stomach," beneath a sheet with which her body was covered, a "black pad" attached to "a little black cord" which extended toward the electric machine. She said "he inserted something into my vagina that spread it," and that he "turned on some machinery." She added, "The machine was turned on before I heard the metal and then afterwards it buzzed and clicked and went off." In response to the question, "Did you feel any sensation?" she replied, "A tingling from the pad." Upon that testimony the electric pad was properly marked for identification. The jury was warranted in assuming it was a device which was attached to the electric machine and which was used to transmit an electric shock for the purpose of causing an abortion.

Subsequently, Dr. H. P. Huppert, a licensed physician who was experienced in obstetrics, was fully examined and cross-examined regarding the use and effect of that electric pad device. After explaining in elaborate detail the in-

struments exhibited to him, he testified that "any method, electrical or mechanical, used on the cervix, as described, during the period of gestation, could cause an abortion. This, *together with the olives* depicted here could be used as a dilator and introduced into the cervix, thereby interfering with the natural plug in the uterus following which Nature will take over and abort the patient." That evidence confirms the testimony of the patient. An abortion actually occurred within a few hours after a second similar treatment. The patient gave birth to a six-month child, which lived but a few hours and died. The evidence appears to be very conclusive that the abortion was procured as a direct result of the use of the electrical devices as related by the witnesses. While the prosecuting officer overlooked formally offering the urethral olive pad and cord in evidence for all purposes, that omission was harmless. The testimony regarding that device was competent and persuasive evidence of guilt even if the electrical pad had not been produced in court.

In the case of *People* v. *Darby,* 64 Cal.App.2d 25 [148 P.2d 48], upon which the appellant relies, the facts were radically different from those of the present case. In that case the defendant was convicted of abortion, and the judgment was reversed. The court criticized the evidence adduced in that case to the effect that the defendant had previously committed abortions upon two other women by the use of "a certain surgical instrument." But there was absolutely no evidence that the defendant had used any surgical instrument whatever upon the patient involved in the abortion for which he was then being tried. The court says in that regard:

"But we have no such situation here. No testimony was given by Mrs. Sylvia or by defendant Darby that any instrument was used. On the other hand, according to the testimony of defendant, the treatment given by him to Mrs. Sylvia was such as is customarily and frequently given to female patients."

Clearly, the evidence of other crimes of abortions committed by means entirely different from Darby's treatment of the patient involved in that case was incompetent and prejudicial because there was no similarity in the method employed which would tend to show the intent of the defendant to unlawfully commit the offense for which he was being tried. No such ob-

jectionable evidence was adduced in the present case. The principle upon which the Darby case was reversed is not involved in this case. It is not authority in support of the appellant's contention in that regard.

In the case of *People* v. *Clapp*, 67 Cal.App.2d 197 [153 P.2d 758], the judgment of conviction of abortion was affirmed. In that case the evidence showed that the defendant caused an abortion of another woman by similar means of administering "caroid solution" and also by use of a speculum. In the Clapp case the evidence showed that the defendant used a speculum and also administered a "brown liquid."

In the case of *People* v. *Wilson, supra*, the judgment of conviction of an abortion was affirmed. In that case the woman upon whom the abortion was committed testified that she could not see whether the defendant used an instrument; that she merely felt something and heard metallic sounds. In spite of that fact the judgment was affirmed on the theory that there was adequate evidence of the use of a surgical instrument. In the present case there was much more definite evidence of the use of a surgical instrument and of the electrical device including the urethral olive pad and attachments.

■■■ We are of the opinion the court did not err in permitting a limited cross-examination of the defendant, directed toward his credibility and inconsistent conduct when he testified on examination in chief, in effect, that he did not admit, in his extrajudicial statement which was received in evidence, that he had "treated the girl twice." On examination in chief, having first read that portion of his extrajudicial statement with reference to the treatment of patients by means of "short-wave infra red" electrical vibrations, in which he was asked, "Did you give any such treatment" to the prosecutrix, and replied, "Twice," the defendant testified as a witness that he did not recall that statement, but added that if he did so state it was because he understood the question to be an inquiry as to how many times the girl had visited his office. On cross-examination, to test the veracity of the defendant's virtual denial that he had admitted treating the patient twice, and to show inconsistent conduct on his part, the prosecution was permitted, over objections, to ask him if, as a matter of fact, he did not actually administer some treatments to her, which he consistently denied.

It is true that the cross-examination of a defendant is confined to "all matters about which he was examined in chief." (Pen. Code, § 1323.) But when a defendant, charged with abortion, takes the witness stand and denies a previous extrajudicial statement in evidence, in which he admitted treating the woman involved therein, it is competent, on cross-examination, to prove that his conduct refutes that denial. (*People v. Creeks,* 170 Cal. 368, 379 [149 P. 821].) A witness may be impeached "by contradictory evidence." (Code Civ. Proc., § 2051.) In the Creeks case, *supra,* it is said in that regard:

"The statute places no limitation or restriction upon the extent or character of his cross-examination 'as to all matters about which he was examined in chief,' and upon these matters he may be cross-examined as fully as any other witness. 'Any question which would have the tendency to elicit from him the whole truth about any matter upon which he had been examined in chief, or which would explain, or qualify, *or destroy the force of his direct testimony,* . . . or to show by his own admissions that he had made contrary statements, *or that his conduct had been inconsistent with the statements given in his direct testimony,* and thus throw discredit upon them, would be legitimate cross-examination.' " (Italics added.)

Quoting with approval from *People v. Dole,* 122 Cal. 486, 491 [55 P. 581, 68 Am.St.Rep. 50], the court further says, in the Creeks opinion, that:

" 'Any fact may be called out on cross-examination which a jury might deem inconsistent with the direct testimony of a witness, and a defendant testifying in his own behalf is in this respect put upon the same plane with other witnesses.' "

In a portion of the defendant's extrajudicial statement, which he did not deny on the witness stand, he admitted that he sometimes treated patients by means of "short-wave infra red" transmitted through an electrical pad placed over the abdomen. Having, in effect, denied that he had ever treated the girl who is involved in this case at any time for any purpose whatever, it was competent for the prosecution to show on cross-examination, if possible, conduct of the defendant inconsistent with his denial. It was inconsistent with the defendant's denial of treatments of the girl to have responded to her call and to have visited her apartment the morning after the last alleged treatment and to have arranged for

her to go to a hospital for delivery of the child, if she was not his patient. He had never met her until the day before the alleged first treatment. The court limited the cross-examination to the sole question as to whether the defendant had in fact treated the girl. That evidence was competent to rebut the denial of treatment by conduct inconsistent therewith. The court did not err in its rulings in that regard.

■ The court did not err in sustaining an objection to defendant's question propounded to the prosecuting witness as follows: "How did you come to know anything about black pills?" She had been previously asked if she had done anything to induce a miscarriage, to which she replied "Yes." She testified that she got the black pills at a drugstore and took several of them, but that they made her sick and she stopped taking them. It appeared that she took the pills in February, about three months before her miscarriage. It seems apparent that the pills did not contribute to the miscarriage. That evidence was too remote. But the defendant's attorney was not precluded by the court from fully inquiring into that subject. He made no attempt to prove when the pills were taken, what drug or properties they contained, or what resulted from her taking them. Evidently he knew that circumstance was too remote to have affected the miscarriage, and he abandoned the subject. The ruling was harmless.

■ Finally, it is contended the court erred in overruling defendant's objections to questions propounded to a character witness on cross-examination. J. J. Litton testified that the general reputation of the defendant for truth, honesty, integrity and "as a law-abiding citizen" was good. On cross-examination, over objections of the defendant, he was permitted to answer questions as to whether he had heard that the defendant "had lived in a state of adultery" and whether he had heard that the defendant "has been engaged in abortion activities" prior to the time of the alleged crime for which he was being tried. To each of those questions the witness replied that he had not heard of those reports.

The court did not err in those rulings. It is proper, on cross-examination of a character witness, to ask him in good faith if he had not heard current reports regarding the conduct of the defendant prior to the alleged charge which may tend to indicate specific traits of character which are involved in the crime for which he is being tried, for the purpose of test-

ing the credibility of the witness and to refute the asserted public opinion regarding tthe general reputation of the defendant. (*People* v. *Sieber*, 201 Cal. 341, 349 [257 P. 64]; *People* v. *Creeks*, *supra*; *People* v. *Haley*, 46 Cal.App.2d 618, 625 [116 P.2d 498]; *People* v. *Buchanan*, 119 Cal.App. 523 [6 P.2d 538]; Underhill's Criminal Evidence (4th ed.) § 172, p. 303.) The Sieber case, *supra*, was similar in principle to the present case. The defendant in that case was charged with homicide. A character witness had testified to his good reputation "as a peaceable law-abiding citizen." The Supreme Court held that it was proper cross-examination for the prosecution to ask the witness if he did not know that "Sieber had lived with a woman who was not his wife, and had held her out to be his wife?" to which he replied "No." The court said, at page 349, concerning that evidence:

"The first question asked was admissible under the rule that a character witness may be cross-examined as to his knowledge of reports of particular and specific charges of the commission of acts inconsistent with tthe trait or character (in this case that the appellant was a law-abiding citizen) which the witness was called upon to prove. (*People* v. *Hightower*, 65 Cal.App. 331, 340 [224 P. 110].) Furthermore, no prejudice resulted to the defendant, because the question was answered in the negative."

In the present case the character witness was asked to testify to the general reputation of the defendant "as a law-abiding citizen." He said his reputation was good in that regard. The effect of that evidence was to give the jury the impression that his reputation *as a law-abiding citizen* was so good that he would not be likely to violate the law by deliberately committing an abortion. That opened the door for evidence on cross-examination that his general reputation in that community as a law-abiding citizen was not good. For that purpose it was competent to ask the witness if he had not heard that he was not a law-abiding citizen, and on the contrary that it was reported he had been living in adultery. At least, it may be said, as the court stated in the Sieber case, it was not prejudicial since the witness replied in the negative.

The other challenged rulings on cross-examination of the same character witness had reference to reports of defendant's general reputation with regard to the practice of procuring abortions. Those questions were clearly competent to test the witness's credibility and to refute the assertion that he had

the reputation of being a law-abiding citizen. There is no indication that the district attorney was not in good faith in propounding those questions.

There does not appear to have been a miscarriage of justice in this case.

The judgment and the order denying a new trial are affirmed.