[Crim. No. 4740.   In Bank.   Feb. 18, 1947.]

THE PEOPLE, Respondent, v. THOMAS H. McMONIGLE, Appellant.

Charles Bagby for Appellant, under appointment by the Supreme Court.

Robert W. Kenny, Attorney General, David K. Lener, Deputy Attorney General, Stephen Wyckoff, District Attorney, and John L. McCarthy, Assistant District Attorney, for Respondent.

SPENCE, J.—In an indictment returned by the grand jury of the county of Santa Cruz, defendant was charged with the murder of one Thora Chamberlain. He entered a dual plea of not guilty and not guilty by reason of insanity. Upon the conclusion of the trial on the general issue, the jury returned a verdict finding defendant guilty of murder of the first degree, without recommendation. Trial was then had on the issue of defendant's sanity at the time of the commission of the offense, which issue the jury likewise resolved against him. Judgment imposing the death penalty was thereupon pronounced, and an automatic appeal therefrom is now before this court. (Pen. Code, § 1239(b).)

Defendant does not challenge the sufficiency of the evidence on either issue. In fact, his brief contains no summarization of the record but refers only to such portions thereof as affect the presentation of his appeal. He argues the following points as grounds for reversal: (1) The giving of an instruction permitting the jury to consider defendant's extrajudicial statements in determining the establishment of the corpus delicti; (2) the admissibility of a collateral criminal act committed by defendant; (3) the relevancy of certain testimony adduced in evidence with respect to defendant's acts prior to the alleged commission of the offense in issue; and (4) the impropriety of the district attorney's comment in his opening argument on the trial of the case. Careful examination

of the entire record, with particular attention to the several matters raised by defendant, discloses nothing approximating prejudicial error which would warrant a reversal. On the contrary, from such review the conclusion is inescapable that defendant was given a fair trial and that the judgment of conviction should be affirmed. A general statement of the facts and circumstances in evidence will suffice before discussing defendant's contentions.

Shortly before 3 o'clock on the afternoon of November 2, 1945, defendant, a married man about thirty-four years old, drove by the high school grounds at Campbell (some eight miles from San Jose), where he saw Thora Chamberlain, a fourteen-year-old school girl on the sidewalk. It was a Friday and Thora, who had just been released from her last class, was on her way to the school's football field to see the game scheduled for that afternoon. According to her classmates, she was wearing the school colors for the occasion— a *red* skirt and *blue* sweater, and two pairs of bobby socks, a *red* and *blue* one on each foot—and she was carrying her school books, her zipper binder and a rooting section cowbell. Defendant stopped his car at the curb, lowered the window and spoke to Thora for several minutes. A number of her schoolgirl friends passed along the sidewalk at that time. One of them testified that Thora called her to the curb and said that the man in the car was "an ex-service man," who wanted someone to take care of his sister's children for about half an hour that afternoon. Defendant was wearing slate gray Navy issue trousers, a Navy type white T-shirt with a blue insignia bearing the words "Londonderry, Ireland" on the front, several service medals, including the "Purple Heart" emblem, and a garrison hat with a water-repellant cover. Thora's friend declined defendant's request and started again for the game as Thora called that she would be along shortly and "to save her a seat." A few minutes later Thora was seen by another schoolgirl friend to enter the car and "drive away" with defendant; "no other persons" were in the car. Thora never returned from that ride and her body has never been found.

Defendant, who was employed as a laborer at a construction yard in Burlingame, reported for work on Saturday morning, November 3, after having been absent "Monday through Friday [of] that week." He stayed on the job through November 8. That night he left his home, telling his

wife that he was only taking the bus to Los Angeles but actually "hitch-hiking" from there to Cottage Hills, Illinois, to visit his father. Agents of the Federal Bureau of Investigation traced defendant as he wandered through the Middle West and kept on his trail as he registered at different hotels under assumed names. They took him into custody in the early morning of December 6, when he arrived by bus in San Francisco. Defendant was then in a semi-conscious condition as the result of having taken a large dose of sleeping tablets, and he was taken to the hospital for observation and medical treatment. He was discharged to the care of the local F.B.I. office on December 8, after the examining doctor declared that "his physical findings and neurological findings were normal," and that defendant then seemed "rational," "mentally clear," and "well oriented in all spheres." Defendant voluntarily remained in the custody of the F.B.I. agents until December 17, when he was released to the Santa Clara County Sheriff and then transferred to the Santa Cruz County authorities.

At the trial the F.B.I. agents testified at great length regarding defendant's reconstruction of the events of his ride with Thora Chamberlain and their extensive searching expeditions for her body. They made trips with defendant over various roads in San Mateo, Santa Clara, and Santa Cruz Counties on December 10, 11 and 12 as defendant, with the professed purpose of doing "everything humanly possible to help them solve this situation," undertook to trace his line of travel on November 2. Upon his return from these several excursions defendant incorporated the itinerary, so given to the F.B.I. agents, in a statement "freely and voluntarily" signed by him on December 12. Therein he claimed that on November 2, 1945, he had taken Thora Chamberlain from Campbell to Los Gatos, thence to Santa Cruz via State Highway No. 17; that from Santa Cruz they proceeded north along the coast via State Highway No. 1 to a point "about three-tenths of a mile south of the San Mateo County line in Santa Cruz County"; and that as they were seated in the front seat of the automobile at that point, the girl was shot by a .32 calibre Colt revolver that he had in the car. His specific statement was: "If I shot her, that is where it took place . . . whatever happened to the girl happened to her at this point . . . there was but one shot fired . . . I do not recall . . . replacing the bullet which was discharged from it on the

occasion the gun was fired on Highway No. 1 at the time this situation happened to the girl. I am satisfied that the girl was dead at the time I proceeded north. While I am not certain as to just what happened with the gun in the front seat of the car, I know it is my responsibility for what occurred at this time.'' Defendant further claimed that he then proceeded north along the coast route to a place which is ''ten and one-half miles approximately north of Half Moon Bay on California State Highway No. 1'' and which is known as Devil's Slide in San Mateo County, where the girl's body was dropped over a three-hundred foot cliff into the ocean.

The F.B.I. agents made an intensive examination of the precipitous terrain of the Devil's Slide area and directed a search of the ocean at the base of the cliff. The girl's body was not found but they did recover a pair of *red* and a pair of *blue* socks, which were nestled in the rock about two-thirds down the face of the cliff and which were positively identified by Thora's parents as belonging to their daughter. The agents also undertook an investigation in and about the construction yard where defendant had worked. In the course of their search they dug up a ''causeway'' and found some ''slate gray trousers.'' When confronted with this evidence, defendant admitted to the agents that these were the trousers that he had worn on November 2; that upon his return to his home that night he had washed them to remove the blood stains, ''but he was fearful he had not removed the traces of blood and remembered that there might be some remnants of blood in the seams of the trousers or the trousers pockets, that therefore he wrapped these trousers up and took them to the [construction company] yard, where upon his first opportunity he had buried them at the point they had been recovered.''

At the trial defendant's fellow-employees testified that upon his return to work on November 3, defendant had boasted that ''he was out with a fifteen year old girl the night before.'' Defendant's employer testified that on November 6 he had given defendant permission to build a small ramp or causeway on the company property adjacent to the yard by filling in a ditch with concrete blocks and dirt, and that defendant worked on that project alone that day. In excavating the premises under defendant's direction following his admission with respect to the ''slate gray trousers,'' the F.B.I. agents unearthed from this ramp-fill various articles which

were positively identified at the trial and introduced in evidence as belonging to Thora Chamberlain: her brown shoes, schoolbooks and papers, zipper binder and cowbell. Defendant previously had caused the F.B.I. agents to do extensive digging in the backyard of his San Mateo home looking for the place "where he had buried the [girl's] clothing," but they found nothing.

The .32 calibre Colt gun to which defendant referred in his statement of December 12, was identified by an F.B.I. agent as one which he found in luggage abandoned by defendant at a hotel in Quincy, Illinois, where, according to the testimony of the hotel manager, defendant stayed in the latter part of November, 1945. This was in the course of defendant's flight to the Middle West. According to defendant, the bullet which was discharged and killed Thora Chamberlain had imbedded itself in the wooden frame of the door post between the right front and rear doors of the car; he had "dug the bullet out" following the homicide and had buried it under a certain tree in the yard of his home. The bullet was found by an F.B.I. agent at the location described, and it was introduced in evidence along with the wooden door post frame containing the bullet hole. Also at defendant's direction, the F.B.I. agents recovered from a drainage ditch along the road near defendant's place of work certain automobile padding and upholstery, which material defendant admitted he had ripped from the front seat of his car after the events of November 2 and "disposed of" because it was blood-stained "after the girl was shot [and] the blood was gushing from her mouth." Special technicians and examiners from the F.B.I. laboratory at Washington, D. C., to which the blood-stained articles, as well as the gun and bullet, were sent for analysis and checking, testified as to their findings corroborative of the presence of human blood on the automobile upholstery and the firing of the bullet from the .32 calibre Colt gun admittedly belonging to defendant.

In statements made subsequently to the one of December 12, 1945, defendant gave differing versions of the homicide, more directly admitting the killing of Thora Chamberlain but assigning different methods and different locations for its perpetration. By a statement given at the San Mateo County Sheriff's Office on January 3, 1946, defendant claimed that he "choked" the girl to death at a point on the beach just northerly of Half Moon Bay and threw her lifeless body over "a

steep cliff" about one-half mile from where her bobby socks were later found. On January 4, at his own request and for the professed purpose of giving a "more accurate and detailed" recital than that contained in his previous day's account, defendant signed in the Santa Cruz District Attorney's office another statement wherein he claimed that he either "stabbed" the girl with his "hunting knife" or "choked" her at a point about ten miles north of Half Moon Bay; and that he threw "the body over the edge of the road" in the vicinity of Devil's Slide. Again on January 19, defendant gave a statement to the F.B.I. agents wherein he claimed that he "had picked up" the girl for the purpose of delivering her into the hands of a "White Slave Ring in San Francisco"; that upon stopping at a place on the road along the ocean "south of Half Moon Bay," he "gave the girl ether" and she "went off to sleep"; that he then drove "to a place on the other side of Half Moon Bay on Number One," where he "choked the girl," disrobed her and left her body hidden near the road for the night; that he returned the next day and took the body to a field adjacent to the construction yard where he worked, placed it in "a drainage ditch" and covered it with some dirt and refuse which he hauled by dump truck from "jobs he was handling." Intensive excavation of this area by the F.B.I. agents with the aid of a bulldozer failed to disclose the girl's body. Finally, defendant reverted to his original story with respect to his disposition of the body over the cliff in the Devil's Slide area, insisting that examination of the rocks there by the F.B.I. agents would disclose "some blood or hair . . . some evidence; [as] that is where the girl's body is." But again their search was to no avail.

Each of the extrajudicial statements contained a recital to the effect of having been given by defendant of "his own free will," for the professed purpose of "clearing up this case so that the body of the girl may be found for the benefit of the girl's parents." Trips totaling some one thousand miles were taken by the F.B.I. men over roads in San Mateo, Santa Clara, and Santa Cruz Counties, often in company with defendant, following his many confusing "leads." Then at the trial defendant took the witness stand in his own behalf and gave an entirely new version of Thora Chamberlain's death. Thus he testified that while driving in Campbell on November 2, he "lost" his way and asked Thora "the directions to San Jose"; that she "willingly got in [the] car" in order to show

him the road, "after she said that she didn't wish to stay on at the school, as there was some sort of game or something going on there"; that he "was driving quite fast at the time" along a country road about a mile and one-half westerly from Campbell when the girl became frightened, "jumped" from the car and "was injured"; that he placed the girl in the car and "headed back towards the town [Campbell]" to "get her in the hospital" but "after she was in [the] car approximately five minues she passed away"; that he then returned to the point where the girl had been injured and buried her body under some leaves "alongside of the road."

On cross-examination defendant claimed that his story at the trial "was true" and in explanation of its inconsistency with the accounts given in his previous statements, he asserted that he "deliberately wouldn't tell them the truth" because of "the attitude of the district attorney" and others in promoting the prosecution in Santa Cruz County. He attempted to explain the bullet hole in the door post of his car by saying that it was caused by the accidental discharge of his gun several months earlier. When queried as to how he would "explain . . . the fact that Thora Chamberlain's socks were found on Devil's Slide on highway number 1," defendant answered: "There is only two ways I figure those socks came at that point . . . they were either placed there at the point or else the statement [that they were found there] is untrue." At the close of the cross-examination, defendant was asked whether he wanted "to go out as a part of these court proceedings and show us the body of Thora Chamberlain" in corroboration of his testimony that he buried her "alongside of the road" near Campbell after she "expired" as the result of her injuries upon "jumping" from his car. Defendant replied that he would like to have such opportunity. Accordingly, arrangements were made for the following morning, but when the court convened at that time as scheduled, defendant declined to go upon advising the court [out of the presence of the jury] that a prisoner in the county jail the preceding night had informed him that the trip would expose him to "mob violence" and he would not be protected therefrom. After some further colloquy between defendant and the court, in which defendant repeated his refusal to make the trip, the jury returned to the courtroom, and the case was argued and submitted.

■ In this state of the record, defendant first contends that the court erred in instructing the jury concerning the evidentiary effect of his extrajudicial statements. The challenged instruction reads as follows: "The Court instructs you that initially and in the first instance the corpus delicti for every criminal case must be proven by satisfactory evidence aside from any statement, confession or admission of the defendant. (Citing cases.) After the latter however have been received in evidence they may strengthen and fortify the proof of the corpus delicti to the extent that the evidence may have that effect." This is a correct statement of the law in recognition of the "sharp distinction between the rule governing the *admission* of extrajudicial statements, admissions or confessions and the rule governing the jury in its *consideration* of such evidence after it is admitted." (*People* v. *Selby,* 198 Cal. 426, 434 [245 P. 426].) "To warrant a conviction" the corpus delicti "must be proven to a moral certainty and beyond a reasonable doubt, but it is not necessary that it should be so proven before other evidence is introduced which corroborates it or strengthens reasonable inferences drawn therefrom." (*People* v. *Ives,* 17 Cal.2d 459, 463 [110 P.2d 408].)

The leading California case on the question of the establishment of the corpus delicti is *People* v. *Selby, supra,* 198 Cal. 426. There, after a full discussion of prior decisions in this state on the subject, the court said at page 437: "It is apparent from this review of the cases that the general trend of authority has been to hold that upon *prima facie* proof of the *corpus delicti* the extrajudicial statements, admissions, or confessions of the accused may be *admitted* in evidence and having been so properly admitted they may, with the evidence aliunde, be be considered by the jury in its determination whether or not all the elements of the crime and the connection therewith of the accused have been established to a moral certainty and beyond all reasonable doubt." Consistent with this premise of distinction, it was said in *People* v. *Mason,* 37 Cal.App.2d 407, at page 409 [99 P.2d 567]: "Where a confession is freely and voluntarily made, it is admissible as evidence in support of the *corpus delicti* as well as of the criminal participation of the accused. Full proof of the *corpus delicti* independently of the confession of the accused is not required; otherwise it could

serve no office except to prove the criminal agency." For like statements of the law, upon citation of the Selby case, see *People* v. *Ives, supra,* 17 Cal.2d 459, 463-464; *People* v. *Domenighini,* 81 Cal.App. 484, 490 [254 P. 292]; *People* v. *Coyle,* 81 Cal.App. 671, 675 [254 P. 597]; *People* v. *Gilbert,* 86 Cal.App. 8, 9-10 [260 P. 558]; *People* v. *Valenti,* 103 Cal. App. 249, 252 [284 P. 485]; *People* v. *Black,* 111 Cal.App. 90, 95 [295 P. 87]; *People* v. *Hudson,* 139 Cal.App. 543, 544 [34 P.2d 741]; *People* v. *Meyers,* 7 Cal.App.2d 351, 355-356 [46 P.2d 282]; *People* v. *Baker,* 25 Cal.App.2d 1, 3-4 [76 P.2d 111]; *People* v. *Chan Chaun,* 41 Cal.App.2d 586, 589 [107 P.2d 455]; *People* v. *Day,* 71 Cal.App.2d 1, 4-5 [161 P. 2d 803]; and *People* v. *Harshaw,* 71 Cal.App.2d 146, 149 [161 P.2d 978]. To the extent that the language in the opinions in *People* v. *Cornett,* 61 Cal.App.2d 98, 105 [141 P.2d 916], and *People* v. *Thompson,* 69 Cal.App.2d 80, 85 [158 P.2d 213], may be said to announce a contrary rule, such language must be disapproved.

In arguing against the propriety of allowing his extra-judicial statements to strengthen "the over-all proof of the corpus delicti," defendant cites such cases as *People* v. *Simonsen,* 107 Cal. 345 [40 P. 440], *People* v. *Besold,* 154 Cal. 363 [97 P. 871], and *People* v. *Vertrees,* 169 Cal. 404 [146 P. 890], which "deal alone with the degree of proof of the *corpus delicti* essential to warrant the *introduction in evidence* of the extrajudicial statements, admissions or confessions of the accused and are, therefore, of little value or assistance in determining the point here involved." (*People* v. *Selby, supra,* 198 Cal. 426, 434.) Nor does it avail defendant to cite *People* v. *Wagner,* 29 Cal.App. 363, 372 [155 P. 649]; and *People* v. *Tapia,* 131 Cal. 647, 651-653 [63 P. 1001], for the proposition that the jury must be "convinced from the evidence beyond a reasonable doubt and to a moral certainty that a criminal homicide was in fact committed" before they might consider the extrajudicial statements of the defendant. These two cases were expressly disapproved in *People* v. *Selby, supra,* upon the court's summarization of the law on the point as follows, at pages 438-439: "It may finally be said that the authorities are unanimous on the proposition that the *corpus delicti* is not required to be established to a moral certainty and beyond a reasonable doubt before the extrajudicial statements, admissions, or confessions of a

defendant may be received in evidence—*prima facie* proof of the *corpus delicti* being sufficient for that purpose. And, with the exception of *People* v. *Tapia, supra,* and *People* v. *Wagner, supra,* the rule is likewise unanimously declared that it is *not* necessary that the jury in resolving the question of the guilt or innocence of a defendant upon all the evidence in the case should, before considering for any purpose the extrajudicial statements, admissions, or confessions of a defendant, be first satisfied to a moral certainty and beyond a reasonable doubt that the *corpus delicti* has been established by evidence *aliunde.*

"When the case is submitted for their verdict the jury may consider *all* the evidence in the case, including the extrajudicial statements, admissions or confessions of the accused, in determining whether or not all the elements of the offense charged and the connection therewith of the accused have been established to a moral certainty and beyond a reasonable doubt. If this were not the correct rule, proof of the extrajudicial statements, admissions, or confessions of the accused would have no utility except to connect him with the crime charged. The general rule is that unless evidence is admitted for a limited purpose it will be considered for every purpose. Any expressions in *People* v. *Tapia, supra,* and *People* v. *Wagner, supra,* to the contrary of what we have declared are at variance with the authorities and are not binding."

It follows from the foregoing that the instruction here challenged was properly given.

■■■ Defendant's second objection rests upon the claim that evidence of a prior criminal act committed by him was improperly admitted, but the record does not sustain him. At the trial it was developed that the distinctive clothing which defendant wore on November 2, was part of the contents of a foot locker which defendant admittedly stole some six weeks previously in San Francisco from a petty officer of the United States Navy. By reference to this serviceman's clothing, and in particular to the white T-shirt with its blue insignia bearing the words "Londonderry, Ireland," various witnesses—such as the proprietor and waitresses at the restaurant near the high school where defendant had his lunch and played "pinball" games until almost 2:30 o'clock in the afternoon, as well as several classmates of Thora Chamber-

lain to whom he was seen talking near the school grounds—identified defendant as having been in Campbell on November 2, 1945. Thus, so far as affecting defendant's identification, the *stolen character* of the clothing was not material; but it does not follow that "the fact of the theft, which was later brought home to the defendant when he took the stand, was introduced solely for the purpose of prejudicing the defendant and blackening his character in the eyes of the jury." The relevancy of the theft to the prosecution's case stems from its integration with the proof of "a design or plan to entice" on defendant's part through wearing a serviceman's clothing as a means of effecting an appealing appearance or "masquerade."

At the trial the serviceman in question testified that he had been a "Chief Commissary Steward in the United States Naval Reserve," stationed in England and Ireland, and that on the afternoon of September 21, 1945, a "four foot locker" bearing his name and service rank, and containing various articles of wearing apparel, was stolen from his car. Upon interrogation as to what specific clothing was in the foot locker at the time of its theft, he included a "Navy T-shirt" with the inscription "Londonderry, Ireland" in blue letters and "slate gray Navy issue trousers" identical in appearance with the trousers introduced in evidence as having been found by the F. B. I. men "buried in a causeway" in the construction yard where defendant had worked. Defendant admitted the theft of the foot locker; and, in fact, it was later found in the garage of defendant's San Mateo home. From these matters in evidence the jury might well have inferred that defendant conceived the idea that the perpetrator of an offense would be less easily detected if at the time of its commission he wore another's clothing, and that defendant deliberately chose to steal a plainly marked serviceman's "foot locker" as probably containing wearing apparel which would enable him to effect a disguise. Moreover, the jury might have inferred from the character of the stolen clothing that defendant at the very time of the theft had some such idea to commit the precise type of crime with which he is here charged and so was anxious to avail himself of any appeal attaching to his masquerade as a serviceman in furthering his ability to prevail upon or "entice" a young girl to "drive off" in his car in response to his request. While the

theft of the foot locker occurred some six weeks prior to the commission of the homicide here at issue, such time element would go only to the weight of the evidence but not to its relevancy as bearing upon the prosecution's theory of defendant's preconceived design or plan of action to "masquerade" as a serviceman; hence the wearing of the "Navy issue trousers," the "Londonderry, Ireland" T-shirt with military medals pinned on the front thereof, and the garrison hat.

The rule sustaining the admissibility in evidence of such relevant prior crime was stated by this court in the recent case of *People* v. *Peete,* 28 Cal.2d 306, at pages 314-315 [169 P.2d 924] : "It is settled in this state, however, that except when it shows merely criminal disposition (*People* v. *Cook,* 148 Cal. 334, 340 [83 P. 43] ; *People* v. *Glass,* 158 Cal. 650, 658 [112 P. 281] ), evidence that is relevant is not excluded because it reveals the commission of an offense other than that charged. 'The general tests of the admissibility of evidence in a criminal case are: . . . does it tend logically, naturally, and by reasonable inference, to establish any fact material for the people, or to overcome any material matter sought to be proved by the defense? If it does, then it is admissible, whether it embraces the commission of another crime or does not, whether the other crime be similar in kind or not, whether it be part of a single design or not.' (Citing numerous authorities.) 'It is true that in trying a person charged with one offense it is ordinarily inadmissible to offer proof of another and distinct offense, but this is only because the proof of a distinct offense has ordinarily no tendency to establish the offense charged. But whenever the case is such that proof of one crime tends to prove any fact material in the trial of another, such proof is admissible, and the fact that it may tend to prejudice the defendant in the minds of the jurors is no ground for its exclusion.' (Citing cases.)" To like effect, see *People* v. *Nakis,* 184 Cal. 105, 114 [193 P. 92].

Nor does it avail defendant to argue that "there was no need" for the prosecution to show "the fact of the theft" as a circumstance connecting defendant with the perpetration of the crime charged, since several witnesses attested to his identity through reference to certain peculiarities in his physical features as well as to his distinctive dress on the day in question. The quantum of evidence, if it is *relevant* to a fact in issue, does not enter into the question of its admissibility.

Speaking to this point, the court in *People* v. *Cook*, 148 Cal. 334, said at page 340 [83 P. 43] : ''The prosecution in a criminal case is not obliged to rest upon evidence which merely establishes the guilt of the defendant *prima facie*—upon evidence, that is to say, which is merely sufficient in law to sustain a verdict of guilty. The guilt of the defendant must be proved beyond a reasonable doubt in order to secure such a verdict, and the district attorney not only may, but ought to, introduce all proper evidence at his command tending to establish the guilt of the defendant, in order to overcome any doubts or scruples of the jurors.'' Accordingly, there was no error here in permitting the prosecution to introduce in evidence ''the fact of the theft'' as part of its case against defendant.

For his third point of objection, defendant urges that ''immaterial evidence was admitted into the record,'' and that he was prejudiced thereby. The challenged evidence concerns the testimony of two little girls, aged seven and eight years respectively, and the mother of one of them. Each of the children testified that as they were walking home together from the Campbell Grammar School, which is situated ''across the street from the high school,'' shortly after 2:30 o'clock in the afternoon of November 2, a man dressed in ''a white T-shirt'' and driving a ''dark sedan automobile'' stopped and asked them if they would take care of his child. They refused and continued on their way home. One of the children further stated that the man in question was wearing ''a service hat'' with ''a vizor,'' and that following his conversation with them, he ''turned around'' and drove ''back towards the high school.'' The purpose of the mother's testimony was to fix the time of the girls' meeting with defendant. (*People* v. *Zimmerman*, 65 Cal. 307, 308 [4 P. 20].) She fixed the event as occurring immediately preceding their arrival home ''around five minutes to three'' on the afternoon of November 2, 1945.

Preliminarily, it should be noted that this evidence was adduced at the trial without objection and no motion to strike was made by defendant's counsel following its introduction. In such circumstances any claim of error is deemed to have been waived. (*People* v. *Fleming*, 218 Cal. 300, 313 [23 P.2d 28] ; *People* v. *Harvey*, 22 Cal.App.2d 532, 535 [71 P.2d 841].) But regardless of the record's disclosure in this respect, defendant cannot prevail in his argument on

the merits. The episode which the girls described was significant both in time and place. In its tendency to show that the man in the "white T-shirt" who accosted these children was in fact the defendant, the evidence was relevant to the issue of identity, for it placed him a short distance from the Campbell High School, but proceeding in that direction, a few minutes prior to his meeting with Thora Chamberlain. Moreover, the evidence in question was relevant to the prosecution's purpose of showing the general scheme or plan upon which defendant operated that afternoon, involving the enticement of young girls into his car under the ruse that he needed someone to care for his children. Dressed in the clothing of a serviceman with medals, including the "Purple Heart," pinned to the front of his shirt, although defendant admittedly had never served in the military forces, defendant apparently was seeking to appeal to their sympathies as a basis for their agreeing to "help" him. (cf. *People* v. *Northcott*, 209 Cal. 639, 653 [289 P. 634, 70 A.L.R. 806]; *People* v. *Cosby*, 137 Cal.App. 332, 335-336 [31 P.2d 218].) The inability of the two little girls who testified against defendant, to identify him in the courtroom during the trial was simply a factor going to the weight of their testimony, a matter for the determination of the jury and one which would tend to operate to defendant's advantage. Nor does it avail defendant to point now to unfavorable "psychological considerations" arising from this evidence by its suggestion of "purposes of enormous evil" on the part of defendant in his dealings with young girls. Regardless of the justification of his present appraisal of the effect of this line of testimony upon the jury, his counsel at the trial apparently did not so view it, for the story of the little girls to which defendant now so violently objects was not even tested on cross-examination. But in any event these alleged adverse "psychological considerations" cannot overcome the propriety of the admissibility of evidence as to defendant's prior conduct relevant to the general issue of his guilt. (8 Cal.Jur. § 154, p. 37.)

Defendant's fourth and final point relates to the remark of the district attorney in his opening statement at the trial that "this indictment was the culmination and result of one of the best organized and most intense investigations in the annals of the crime of kidnapping and murder." Defendant apparently objects to the reference to the "crime of kidnapping," but there is no merit to his argument. Irre-

spective of the untimeliness of his objection, raised for the first time on appeal (*People* v. *Boggs*, 12 Cal.2d 27, 40 [82 P.2d 368]; *People* v. *Wagner*, 62 Cal.App.2d 597, 601 [145 P.2d 646]), it is manifest from the foregoing review of the evidence that the scope of the district attorney's preliminary remark was fully justified. The abduction of Thora Chamberlain by defendant was inextricably linked to the murder charge in this case, so that the district attorney's comment on the dual nature of defendant's offense was but properly anticipatory of the sequence of events on which the prosecution relied to secure a verdict of conviction against defendant.

In the light of the foregoing discussion, the judgment is affirmed.

Gibson, C. J., Shenk, J., Edmonds, J., Carter, J., Traynor, J., and Schauer, J., concurred.

Appellant's petition for a rehearing was denied March 17, 1947.